UNITED STATES of America,
et al., Plaintiffs,

v.

State of WASHINGTON,
et al., Defendants.

No. CV 9213.

United States District Court,
W.D. Washington.

COMPILATION OF MAJOR
POST–TRIAL SUBSTANTIVE ORDERS
(January 1, 1994 through December 31,
1994)

## TABLE OF CONTENTS

ORDER                                                                        PAGE

Order Denying Summary Judgment re: Certain Species and Deep–Water
Harvest (1/14/94)                                                             1128

Order Clarifying Prior Order Denying Summary Judgment re: Certain Species
and Deep–Water Harvest (2/1/94)                                              1131

Order Denying Cross–Motions for Summary Judgment (2/7/94)                    1131

Consent Decree Regarding Shellfish Sanitation Issues (5/4/94)                1134

Consent Decree (11/28/94)                                                    1169

Memorandum Opinion and Order. 873 F.Supp. 1422 (12/20/94)        See Appendix

### COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS
(Through December 31, 1986)

### ORDER DENYING SUMMARY JUDGMENT RE: CERTAIN SPECIES AND DEEP–WATER HARVEST

Subproceeding No. 89–3

(January 13, 1994)

EDWARD RAFEEDIE, District Judge.

**TO ALL COUNSEL OF RECORD:**

The Court has read and considered the papers supporting and opposing the state of Washington's motion for partial summary judgement regarding certain species and deep-water harvest. The Court finds that the two theories advanced by the State of Washington are inconsistent with a proper interpretation of the Stevens Treaty. Accordingly, these theories are rejected, and partial summary judgment is DENIED.

### INTRODUCTION

The State of Washington ("Washington") has moved for partial summary judgment to establish that the right of the tribes to harvest shellfish is limited to exclude:

(1) Species that were not harvested at or before treaty time, such as shrimp, scallops, squid or abalone

(2) Shellfish harvested in deep-water areas where no harvesting occurred at or before treaty time, such as sea cucumbers, sea urchins, octopus, geoduck and crab.

**Standard for Summary Judgment**

Fed.R.Civ.P. 56(c) provides that summary judgment will be granted if the moving party can establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978). It is the moving party's burden to inform the Court of the basis for its belief there are no genuine issues of material fact and this may be demonstrated by pointing out an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**Principles of Treaty Interpretation**

According to *United States v. Choctaw Nation,* 179 U.S. 494, 531, 21 S.Ct. 149, 163, 45 L.Ed. 291, 306 (1900), the intentions of the parties to the treaty will control the treaty's interpretation. In determining the intentions, a Court should look to "the words used—the words being interpreted, not literally nor loosely, but according to their ordinary signification. If the words be clear and explicit, leaving no room for doubt what the parties intend-

ed, they must be interpreted according to their natural and ordinary significance." *Id.* (emphasis added).

◼ Therefore, under the familiar canon of statutory construction, the starting point for interpreting a statute (in this case a treaty) is the language of the statute itself and "absent a clearly expressed legislative intention to the contrary, ... [treaty] language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); See also *Sumitomo Shoji America Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("Clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent of expectations of its signatories").

◼ Special canons of construction are applied to determine the meaning of Indian treaties. These canons provide that any ambiguities in language must be resolved in favor of the Indians, that the language should not be construed to the prejudice of the Indians, and that technical meanings should be avoided in favor of the understanding of the Indians. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. 658, 675–676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 528, 8 L.Ed. 483 (1832); *Winters v. United States*, 207 U.S. 564, 577, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *U.S. v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). Finally, the Supreme Court stated in *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) that Indian treaties should not be viewed as grants of rights to the Indians, but as grants of rights from the Indians to the United States. Any rights which were not granted by the Indians to

the United States were reserved by the Indians because the Indians already possessed them.

## Washington Theory Number One: Species Limitation

◼ Washington begins with a factual assertion that the Tribes did not harvest certain species of shellfish, such as shrimp and scallops ("named species"), at or before treaty time. On that basis, Washington argues that the Stevens Treaty covers only species of fish harvested at or before treaty time, and that the Tribes therefore have no treaty right respecting the named species.

The starting point in evaluating this theory is the treaty language itself:

> The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens.

The Court has already held that shellfish are fish. Since the named species are shellfish, they are fish as well, and are covered by the treaty. There is no language in the treaty that undermines these simple propositions.

◼ Any attempt by Washington to read such a limitation into the treaty must fail. All of the canons of treaty construction obstruct such an inference, but one such canon is particularly lethal to Washington's theory: the "reservation of rights" canon. It is well-settled that treaties are to be construed as a grant from the Indians to the United States, not the reverse, and that any rights specified in the treaty

are deemed "reserved" by the Indians. *See, e.g. Winans, supra; U.S. v. Washington,* 520 F.2d 676, 684 (9th Cir.1975). Prior to the signing of the Stevens Treaty, the Indians had the absolute right to harvest any species they desired. They had the right to harvest shrimp and scallops; whether or not they exercised that right is irrelevant. The right to fish reserved in the treaty therefore encompasses a right to harvest the named species.

This finding is consistent with the prior findings of this Court. In *U.S. v. Washington,* 384 F.Supp. 312, 401 (W.D.Wash. 1974), Judge Boldt established as a conclusion of Law that:

> [t]he right secured by the treaties to the Plaintiff tribes is not limited as to species of fish, the origin of fish, the purpose or use, or the time or manner of taking, except to the extent necessary to achieve preservation of the resource and to allow non-Indians an opportunity to fish in common with treaty right fishermen outside reservation boundaries.

Thus the law of the case as well as the principles of treaty interpretation repudiates the first theory advanced by Washington.

## Washington Theory Number Two: Deep–Water Harvest

■ The second limit on the Tribes' treaty rights sought by Washington relies on the "usual and accustomed grounds and stations" clause in the Stevens Treaty. Washington argues that deep-water areas are excluded as a matter of law from all Tribes' usual and accustomed grounds, because none of the tribes engaged in deep-water harvest at or before treaty time.

Determination of each tribe's usual and accustomed grounds requires a factual in-quiry by the Court; each tribe must come forward and prove its usual and accustomed grounds and stations at the time the treaty was signed. However, Washington wishes to pre-empt some portion of this factual determination, and have the Court exclude all deep-water areas from treaty coverage. The Court declines to make such a finding.

As discussed above, prior to the signing of the Stevens Treaty, the Tribes had the absolute right to fish for whatever species they desired within their usual and accustomed grounds. Similarly, they had the absolute right to plumb any depths within those usual and accustomed grounds. Just as it is irrelevant that the Tribes chose not to harvest the named species, it is irrelevant that they <u>could not,</u> because of technological limitations, harvest shellfish in deep-water areas. Had it been availed of the technology, any tribe could have harvested shellfish in the deep waters of their usual and accustomed grounds, areas where they had previously fished only for anadromous fish.

Consistent with these observations, the Court concludes as a matter of law that usual and accustomed grounds and stations do not vary with the species of fish, and that the usual and accustomed grounds and stations for non-anadromous fish are coextensive with those of anadromous fish. And, as there is ample evidence that at least some of the tribes' usual and accustomed grounds and stations for anadromous fish include deep-water areas, *See e.g., United States v. Washington,* 384 F.Supp. at 367, 369, 371, 374, the Court will not exclude deep-water areas from any determination of usual and accustomed grounds and stations in this case.

IT IS SO ORDERED.

The Clerk of the Court is directed to send copies of this Order to all counsel of record and others entitled to notice, via United States mail, immediately.

ORDER CLARIFYING PRIOR ORDER DENYING SUMMARY JUDGMENT RE: CERTAIN SPECIES AND DEEP–WATER HARVEST

Subproceeding No. 89–3

(February 1, 1994)

EDWARD RAFEEDIE, District Judge.

**TO ALL COUNSEL OF RECORD:**

On January 6, 1994, the Court issued an order denying summary judgment to defendants regarding the issues of certain species and deep-water harvest. The parties have interpreted the Court's order as a grant of summary judgment in favor of plaintiffs. It was not the Court's intention to bestow this benefit upon the non-moving party. Notwithstanding any language in the order indicating otherwise, it was the Court's intention to reject the interpretation offered by defendants, not to adopt an alternative interpretation as a matter of law. The order was neither a grant of summary judgment, nor a partial adjudication of issues; it was merely a denial of summary judgment. Any language indicating otherwise should be disregarded. The issues raised in the summary judgment motion remain to be resolved at trial. The plaintiff tribes, all of them, must still come forward with evidence proving usual and accustomed grounds.

IT IS SO ORDERED.

The Clerk of the Court is directed to send copies of this Order to all counsel of record and others entitled to notice, via United States mail, immediately.

ORDER DENYING CROSS–MOTIONS FOR SUMMARY JUDGMENT

Subproceeding No. 89–2

(February 8, 1994)

BARBARA J. ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on cross-motions for summary judgment by the Lummi Tribe and by four other tribes regarding the Lummi Tribe's cross request for determination regarding its usual and accustomed fishing grounds. Having reviewed the motions together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

I. FACTUAL BACKGROUND

This subproceeding involves the issue of whether the Lummi Tribe's usual and accustomed fishing grounds include the Strait of Juan de Fuca, Admiralty Inlet and the mouth of Hood Canal. Judge Boldt made an initial determination in *United States v. Washington*, 384 F.Supp. 312 (1974), concerning the extent of the Lummi Tribe's usual and accustomed fishing grounds:

> In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle, and particularly Bellingham Bay. Freshwater fisheries included the river drainage systems, especially the Nooksack, emptying into the bays from Boundary Bay south to Fidalgo.

Finding of Fact 46, Final Decision No. 1, 384 F.Supp. at 360–61 (hereafter "Final Decision No. 1").

In 1989, the Lummi Tribe issued regulations opening to Lummi tribal members

fisheries in the Strait of Juan de Fuca, Discovery Bay and Admiralty Inlet and the northernmost portion of Hood Canal. Plaintiff-intervenors Skokomish, Jamestown S'Klallam, Lower Elwha S'Klallam and Port Gamble S'Klallam Tribes ("the Four Tribes") promptly filed a request for determination by this court that the Lummi Tribe's usual and accustomed areas do not include the Strait of Juan de Fuca, Discovery Bay, Admiralty Inlet or Hood Canal. The Lummi Tribe responded that it had been granted these areas in Final Decision No. 1. In the alternative, it filed a cross request for determination that these areas are included within its usual and accustomed fishing grounds.

In an order entered on February 15, 1990, Judge Coyle rejected the Lummi Tribe's argument that the geographic scope of Judge Boldt's Final Decision No. 1 on the Lummi usual and accustomed fishing areas included the Strait of Juan de Fuca, Admiralty Inlet and the mouth of Hood Canal. Both the Four Tribes and the Lummi Tribe now move for summary judgment on whether the disputed areas should be added to the Lummi usual and accustomed fishing grounds.

## II. LEGAL ANALYSIS

### A. Issue Preclusion

█ Before reaching the merits of the issue, the Four Tribes first contend that the Lummi Tribe's attempt to bring an action expanding its usual and accustomed fishing grounds is precluded by Final Decision No. 1. The Four Tribes point out that, pursuant to paragraph 25 of the order entered in Final Decision No. 1, "[t]he parties or any of them may invoke the continuing jurisdiction of this court in order to determine: ... the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision I. ..." (emphasis supplied)

384 F.Supp. at 419. The Four Tribes argue that the Lummi Tribe is precluded from relitigating the question of its rights in the disputed areas because Judge Boldt specifically rejected the Lummi Tribe's claims to any fishing rights in those areas in Final Decision No. 1.

In Judge Coyle's order of February 15, 1990 interpreting Judge Boldt's Final Decision No. 1 on the question of Lummi Tribe usual and accustomed fishing areas, Judge Coyle held that Judge Boldt did not intend to include the disputed areas in the Lummi Tribe usual and accustomed fishing grounds. But that is not the same as concluding that Judge Boldt specifically rejected the Lummi Tribe's claim to rights in the disputed areas.

Based on the record before it, this court is not willing to find that Judge Boldt determined the issue currently before the court within the meaning of paragraph 25 of the Final Decision No. 1 so as to preclude the Lummi Tribe from raising it now. As Judge Coyle pointed out, Judge Boldt relied heavily on the expert testimony of Dr. Barbara Lane in reaching the conclusions stated in Final Decision No. 1. 384 F.Supp. at 350. In a declaration executed on March 23, 1989 in connection with this subproceeding at ¶5, Dr. Lane averred that "[a]t the time of [her] 1973 reports and testimony, [she] had not reached, expressed or intended any conclusion that the treaty-time U & A fishing grounds and stations of the predecessor Indians to the present Lummi Tribe included [the disputed areas]." On the other hand, she did not negate the possibility either. Her declaration went on to say that "[i]n the time available, ... [she was] unable to formulate a conclusion on treaty-time existence or extent of fishing activity by those Lummi predecessors in those waters." Id. Given Judge Boldt's extensive reliance on Dr. Lane's expertise, the court

doubts that he would have gone beyond her mere reservation of judgment to reject outright the Lummi Tribe's claims to the disputed areas. Certainly there is nothing on the record to indicate that he did so.

### B. Appropriateness of Summary Judgment

■ Regarding the question of whether summary judgment is appropriate, the Lummi Tribe offers affidavits from Dr. Wayne Suttles, Samuel Cagey and Clarence Cagey. Dr. Suttles is an anthropologist who has done research on the Coast Salish peoples, including the Lummis. Dr. Suttles avers as follows concerning the issue in this case:

> 4. It is my opinion that during the mid–19th century the Lummi and Samish people, whose territory included most of the San Juan Islands, customarily and routinely fished in the eastern Strait of Juan de Fuca, that is, the body of water partially enclosed by the San Juan Islands, southeastern Vancouver Island, the northeastern Olympic Peninsula, and Whidbey Island. They also fished in other waters.

> 5. In the eastern strait of Juan de Fuca, the Lummi and Samish caught, among other fishes, salmon (by trolling and with reef nets) and halibut. This fishing was a part of their regular food gathering activity.

Dr. Suttles also comments that there was extensive intermarriage among the peoples inhabiting the shore of the eastern Strait of Juan de Fuca, resulting in frequent visits among families in different villages and participation in local resource-harvesting activities including fishing. Id. at ¶ 6.

Samuel and Clarence Cagey, the authors of the other two declarations submitted by the Lummi Tribe in support of its motion for summary judgment, are brothers and enrolled members of the Lummi Nation.

Born in 1924 and 1934, respectively, they are tribal elders who attest to having fished all of their adult lives. Both state that in their youth, relatives including their father, who was born in 1871, and their uncles told them about traditional fishing places including "in and around the San Juan Islands, Samish Bay., the Samish River, Point Roberts, the eastern part of the Juan de Fuca Strait, South Whidbey Island, around the north-eastern part of the Olympic Peninsula, and Admiralty Inlet." Samuel Cagey Dec., ¶ 9; Clarence Cagey Dec., ¶ 13.

In response, the Four Tribes point out several flaws in the declarations on which the Lummi Tribe relies. Regarding Dr. Suttles' declaration, the Four Tribes contend that he failed to cite any factual evidence in support of his opinion about the Lummi traditional fishing grounds. Indeed, his declaration merely states:

> 7. I base my opinions expressed in this declaration on my own research, especially the work that went into my doctoral dissertation but including my later work in the region, which contributed to articles that appear in my Coast Salish Essays and others listed in my curriculum vitae. My opinions have, of course been developed in the light of the work of others in this region, including, but not confined to, Franz Boas, Erna Gunther, Bernhard Stern, Diamond Jenness, Homer Barnett, W.W. Elmendorf, and Wilson Duff, as well as the early historical accounts. They have also developed in the light of discussions with other scholars, including, but not confined to, W.W. Elmendorf, Barbara Lane, and Michael Kew.

As for the Cageys' declarations, the Four Tribes emphasize that they did not discuss treaty time fishing activity. Neither the declarants nor the relatives with whom they discussed fishing grounds in their

youth were alive during treaty time. Based on these flaws in the evidence offered by the Lummi Tribe, the Four Tribes contend that the Lummi Tribe has failed to make a showing sufficient to withstand summary judgment on the issue of whether the disputed areas are within the Lummi Tribe's usual and accustomed fishing grounds.

The court agrees with the Four Tribes that Dr. Suttles' as well as Samuel and Clarence Cagey's declarations are plagued by fundamental weaknesses. Nevertheless, the court is not willing at this juncture to conclude that summary judgment for the Four Tribes is appropriate.

While Dr. Suttles' declaration in itself is remarkably devoid of any reference to specific evidence on which he relied in reaching the opinion stated, his curriculum vitae reflects an extensive background stretching back more than forty years in researching the history of Northwest Coast Indians. For purposes of surviving summary judgment, the court will accept Dr. Suttles' general qualifications as an expert in the field and provide him the opportunity to substantiate the opinion stated in his declaration with specific factual and documentary evidence.[1] The court has also taken account of the Four Tribes' concern about the vagueness and ambiguity inherent in Dr. Suttles' description of the area to which he refers in his declaration. The court will expect Dr. Suttles to clarify the boundaries of the geographic areas to which he refers together with the specific documentation pertinent to each area.

As for Samuel and Clarence Cagey's declarations, the court finds that they are very weak evidence. But while they fail to address fishing practices during treaty time, they are not entirely irrelevant. Coupled with Dr. Suttles' opinion in his declaration, the court finds that the Lummi Tribe has presented sufficient evidence to at least survive summary judgment.

## III. CONCLUSION

The Four Tribes' and the Lummi Tribe's cross motions for summary judgment are accordingly DENIED.

### CONSENT DECREE REGARDING SHELLFISH SANITATION ISSUES

Subproceeding 89-3

(May 4, 1994)

EDWARD RAFEEDIE, District Judge.

## I. PARTIES

A. This Consent Decree is entered into by and between the plaintiffs United States of America, Hon. Tribe, Jamestown S'Klallam Tribe, Lower Elwha S'Klallam Tribe, Lummi Nation, Makah Tribe, Muckleshoot Tribe, Nisqually Tribe, Nooksack Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe, Quileute Tribe, Quinault Indian Nation, Skokomish Tribe, Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian tribal Community, Tulalip Tribes, Upper Skagit Tribe, and Yakama Indian Nation, defendant the State of Washington and defendant state officers ("the state defendants"), all of whom, plaintiff and

---

1. As the Four Tribes noted in their reply brief, p. 7, Judge Boldt relied on Dr. Barbara Lane's reports in making his determinations about treaty time tribal fishing grounds because "in specific facts, the reports ... have been exceptionally well researched and reported." 384 F.Supp. at 350. Judge Boldt also remarked that "Dr. Lane's opinions, in-ferences and conclusions based upon the information stated in detail and well documented in her reports, appeared to the court to be well taken, sound and reasonable." *Id.* Thus, Judge Boldt placed his trust in Dr. Lane's ultimate conclusions because she substantiated them with detailed documentation. This court will expect no less of Dr. Suttles.

defendant, are referred to hereinafter as "the parties".

B.  Plaintiff tribes are federally-recognized Indian tribes.  The plaintiff tribes, or other tribes or bands of which the plaintiff tribes are successors-in-interest, are parties to treaties with the plaintiff United States executed by their representatives in the 1850's, each of which reserves to the tribes, in substantially identical language, "the right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing.... Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens." [quoted from Art. III, Treaty of Medicine Creek, 10 Stat. 1133] Tribes regulate the shellfishing activities of their members to protect public health.

C.  The United States Food and Drug Administration ("FDA") is the agency of plaintiff United States having primary responsibility for protecting the public from shellfish-borne illness.  FDA prepares and publishes the National Shellfish Sanitation Program ("NSSP") Manual of Operations, which contains standards to be used in regulating commerce in clams, oysters, mussels and scallops in order to protect the public from shellfish-borne illness. FDA also publishes the Interstate Certified Shellfish Shippers List, which identifies all persons and entities who have been determined by FDA or by an FDA-approved Shellfish Sanitation Control Agency to be in compliance with the NSSP Manual and whose product may be shipped interstate.

D.  The state regulates shellfish harvest, processing and sale in order to protect public health.  The state is a member of the Interstate Shellfish Sanitation Conference ("ISSC"), an organization of states, the shellfish industry, and federal agencies operating under a Memorandum of Understanding with FDA. The ISSC provides a forum for its members to discuss shellfish sanitation issues, and it suggests changes in the NSSP Manual to the FDA.

II.  RECITALS

A.  As used in this Decree, "covered claims" means claims of the plaintiffs, set forth in Part I of the Final Pretrial Order approved by the Court in this subproceeding, that relate to the application to or enforcement against the plaintiff tribes of state laws, regulations, or policies which regulate the taking, possession, or disposition of shellfish in order to protect the public from shellfish-borne illness; and the claims of the State of Washington set forth in Part II.B.1. of that Pretrial Order; and any claim of any party related to the authority of the state to regulate treaty shellfishing activities in order to protect the public from shellfish-borne illness, which claim could have been adjudicated in this subproceeding had it been prosecuted to final judgment.  For the purpose of determining whether claims could have been adjudicated, reference shall be made to the facts and allegations made in the documents filed with the Court in this subproceeding prior to the date of entry of this Decree which relate to the protection of the public from shellfish-borne illness, including facts and allegations made in the Requests for Determination, the Amended Request for Determination, the Response of the State to the Requests for Determination, and the Pretrial Order approved by the Court pursuant to Local Civil Rules 16 and 16.1 of this Court.

B.  This subproceeding was filed in 1989 seeking declaratory and injunctive relief regarding the treaty right to take shellfish, including a declaration and injunction regarding the authority of the

state to regulate treaty shellfishing activities for public health purposes.

C. The United States and the tribes seeking relief in this subproceeding have claimed that their treaties substantially restrict state authority; these tribes, however, have acknowledged a willingness to abide by state regulation of treaty shellfishing activities to protect public health, so long as such regulation is reasonable and necessary, non-discriminatory, and meets appropriate standards. The United States and these tribes have further claimed that some state shellfish sanitation laws, regulations and policies do not meet this test and cannot be enforced against tribal treaty shellfishing activities.

D. The state defendants claim that they may regulate Indian treaty shellfishing activities of plaintiff tribes to protect human health, safety and welfare, provided any such regulations are reasonable and non-discriminatory. The state has denied plaintiffs' claims regarding the restricted applicability of its shellfish sanitation laws to Indian treaty shellfishing.

E. Without admission or adjudication of any covered claim, and without waiving any objection, claim, or defense with regard to claims other than the covered claims, in settlement of the covered claims the parties have agreed, upon entry of this Consent Decree, to participate in a cooperative investigatory and regulatory program to protect the public from food-borne illness associated with the consumption of contaminated shellfish. The tribes have agreed that the performance criteria and other satisfactory compliance provisions of the NSSP Manual will govern their treaty shellfishing activities, with regard to species to which the Manual applies. In addition, the parties have agreed to mechanisms whereby any plaintiff tribe having treaty shellfishing rights may implement certain shellfish sanitation measures independently of the state.

F. The terms of this Decree are not intended, nor could they be expected, to specify every detail of the operation of the cooperative shellfish sanitation program. The parties have attempted to specify, in the Appendix to the Settlement Agreement which is part of this Decree, some of the details, particularly technical ones, involved in the operation of their cooperative program. Some such details must, of necessity, change as scientific knowledge of shellfish and public health change. Therefore, the parties have established mechanisms in the Settlement Agreement and Appendix for the further refinement of their cooperative program.

G. The parties agree that the covered claims raise matters of sovereign interest, and that their settlement of the covered claims as set forth in this Decree is fair, adequate, reasonable, equitable and in the public interest and is made in good faith after arms-length negotiations, and that entry of this Consent Decree is the most appropriate means to resolve the matters covered herein.

NOW, THEREFORE, before the taking of any testimony, before the adjudication of the covered claims, and without admission of any issue of law, fact, or liability by the parties, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

III. ORDER

A. The Court has jurisdiction over the subject matter of the covered claims and over the parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1362. Plaintiffs assert, but the state defendants contest, that the Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and this Court's continuing jurisdiction as declared in ¶ 24 of the Declaratory Judgment and Decree of February 12, 1974, 384 F.Supp. 312 at 408.

All parties to this Decree, for purposes of the entry and enforcement of this Decree, waive all objections and defenses they may have to the jurisdiction of the Court, or to venue in this District, or to service of process prior to the entry of this Decree but not afterwards.

■ B. The provisions of this Decree shall apply to and be binding on the parties, their agencies, subdivisions, boards, and commissions, all agents and officers thereof, and all successors and assigns of all such entities and individuals; and each of them are hereby enjoined to comply with the provisions of this Decree. Changes in the organizational structure of a party or any of its agencies, subdivisions, boards and commissions shall have no effect on its obligations under this Decree.

C. The attached Settlement Agreement, including the Appendix, is hereby incorporated by reference in and made a part of this Decree as if fully set forth herein.

D. Except as specifically provided for otherwise in the Settlement Agreement, the plaintiffs covenant not to sue or to take any other judicial or administrative action against any state defendant, and the state defendants covenant not to sue or to take any other judicial or administrative action against any plaintiff, or against any member of a plaintiff tribe, for covered claims or for any claims relating to or arising from the filing and litigation of the covered claims and the negotiation, terms, approval and implementation of this Decree.

E. If for any reason the Court should decline to approve this Decree in the form presented, any statements made in negotiation and the terms herein may not be used as evidence in any litigation or administrative proceeding.

F. Each undersigned representative of the parties certifies that he or she is fully authorized to enter into the terms and conditions of the Decree and to legally execute, and bind such party to, the Decree.

G. The terms of this Decree may be modified only by a subsequent written agreement executed by all the parties and approved by the Court. Notwithstanding the foregoing, the parties by written agreement and without the need for Court approval may modify or amend the Appendix to the Settlement Agreement, other than Attachment A thereto, relating to procedures for the development of implementation protocols and policies, which shall not be amended without Court approval.

H. If for any reason the Court declines to approve this Decree in the form presented, this Decree and the settlement embodied herein shall be voidable at the sole discretion of any party upon written notice to all parties and to the Court.

I. This Consent Decree shall be effective upon the date of its entry by the Court.

J. The Court shall retain jurisdiction for purposes of entering such further orders as may be appropriate for the construction, implementation, or enforcement of the Decree. In the event that the jurisdiction retained in this paragraph, or the continuing jurisdiction of the Court over Civil No. 9213 or over this subproceeding, is terminated, this Decree shall be enforceable in the same manner as any final judgment and order of the Court.

K. The use of the terms "primary responsibility" and "concurrent jurisdiction" in the Settlement Agreement shall not be construed to confer or enlarge the jurisdiction of any plaintiff tribe over non-Indians.

By signature below all parties consent to entry of this Decree as an Order of the Court.

**1138**

SETTLEMENT AGREEMENT

REGULATION OF TREATY
SHELLFISHING FOR
HEALTH PURPOSES

Subproceeding 89–3

## CONTENTS

I. ESTABLISHMENT OF COOPERATAIVE, INTERGOVERNMENTAL
SHELLFISH SANITATION PROGRAMS ...........................1139
  A. Objectives/Applicability Of National Shellfish Sanitation Program
Manual ......................................................1139
  B. FDA Approved, Independent Tribal Shellfish Sanitation Control
Agencies ...................................................1140
  C. Development And Expansion Of Intergovernmental Shellfish
Sanitation Programs/Technical Assistance .........................1141

II. LICENSING, INSPECTION AND CERTIFICATION FOR
INTERSTATE AND INTRASTATE SHIPMENT......................1142
  A. Tribes May Assume Primary Responsibility For Individual And
Tribal Shellfish Operations.....................................1142
  B. State To Exercise Primary Responsibility...........................1143
  C. Tribal Certification—Compliance with NSSP Manual Part II ............1144
  D. License Fees ................................................1144

III. SHELLFISH SANITATION CRITERIA AND MEASURES
APPLICABLE TO TREATY SHELLFISHING ACTIVITIES ............1144
  A. Compliance With NSSP Manual Sufficient ..........................1144
  B. Emergencies–Additional Measures, Including Closures, May Be
Applied To Treaty Shellfishing When Essential In Responding
To A Health Emergency.......................................1145
  C. Commercial Harvests From Closed Areas Shall Be Prohibited ..........1145
  D. Commercial Harvests From Closed Areas Permissible If Not For
Human Consumption ........................................1146
  E. Joint Identification And Development Of Protocols, Standards And
Other Guidance For Implementation Of The NSSP Manual ...........1147
  F. Growing Area Classification/Certification ..........................1147

IV. EXCHANGE OF REGULATIONS AND DATA/REPORTING
ILLNESSES ................................................1149

V. STATE AUDIT OF TRIBAL PROGRAMS .............................1149

VI. ENFORCEMENT ...............................................1149

VII. NOTIFICATION ...............................................1152

VIII. DISPUTE RESOLUTION .........................................1152
  A. Matters Reviewable ...........................................1152
  B. Dispute Resolution Committee ..................................1153
  C. Appointment Of Master Expert...................................1154
  D. Review Procedure ............................................1154

IX. CONSISTENCY OF AGREEMENT WITH NATIONAL SHELLFISH
SANITATION PROGRAM/ANTI–DISCRIMINATION PROVISION ......1155

X. AMENDMENTS ................................................1155

    XI.   INTENT TO BIND POLITICAL SUBDIVISIONS, ETC ..................1155

    XII.   JUDICIAL APPROVAL.........................................1155

APPENDIX ..................................................1156

SHELLSTOCK HARVEST FOR BAIL PROPOSED REQUIREMENTS .............1157

SHORT–TERM RELAYING PROTOCOL AND GENERAL REQUIREMENTS ......1158

PROCEDURES FOR ESTABLISHING SANITARY LINES IN SHELLFISH
GROWING AREAS ..........................................1162

PROCEDURES FOR ESTABLISHING SANITARY LINES AROUND
WASTEWATER OUTFALLS ...................................1163

PROCEDURES FOR ESTABLISHING SANITARY LINES AROUND
MARINAS ...............................................1164

MINIMUM QUALIFICATION FOR STANDARDIZED SHELLFISH
INSPECTORS ............................................1165

MINIMUM QUALIFICATIONS FOR CONDUCTING WATER QUALITY
STUDIES ...............................................1166

MINIMUM QUALIFICATIONS FOR CONDUCTING SHORELINE SURVEYS....1166

EXAMPLES OF EFFECTIVE TRIBAL PROGRAMS TO PREVENT SALE OF
CEREMONIAL AND SUBSISTENCE HARVEST ...........................1167

## REGULATION OF TREATY SHELL-FISHING ACTIVITIES FOR HEALTH PURPOSES

### SETTLEMENT AGREEMENT

The plaintiff tribes, United States, and State of Washington, in settlement of the health protection issues raised in *United States v. Washington,* W.D. Wash. Civil No. 9213, Subproceeding 89–3, which involve the scope of state authority to regulate treaty shellfishing activities for shellfish sanitation, agree as follows.

### I.  ESTABLISHMENT OF COOPERA-TIVE, INTERGOVERNMENTAL SHELLFISH SANITATION PRO-GRAMS

### A.  Objectives/Applicability of National Shellfish Sanitation Program Manual

The tribal, United States, and state governments, which are parties to this Agreement [hereafter "parties"], recognize that they share a strong concern for shellfish sanitation and the enforcement of effective measures to protect the public from health hazards associated with shellfish contamination. The parties agree that these mutual objectives can be effectively addressed by cooperative, intergovernmental shellfish sanitation programs in which the state and tribes accept varying degrees of responsibility for shellfish sanitation matters related to treaty shellfishing activities. The parties agree that these intergovernmental programs are appropriate not only in protecting public health but also in address-

ing the jurisdictional issues surrounding treaty shellfishing rights, the special federal/tribal relationship, and the State of Washington Centennial Accord. In implementing all aspects of this Agreement, the parties agree to be guided by the unique legal and political status of the tribes, to the extent the level of health protection provided by the programs would not be compromised. The State of Washington agrees to support separate tribal representation in the Interstate Shellfish Sanitation Conference ("ISSC") and other intergovernmental organizations involved in the development of shellfish sanitation standards, data, training or information. The tribes agree that the performance criteria and other satisfactory compliance provisions of the National Shellfish Sanitation Program ("NSSP") Manual, currently in effect, or as subsequently adopted, shall govern their treaty shellfishing activities. The tribes retain the right to propose and pursue changes in the NSSP Manual, in applicable federal law, and in any state shellfish sanitation laws, regulations, or policies. In proposing and pursuing such changes, the tribes will not challenge the application of the terms of this Agreement to them or their members as inconsistent with their treaty rights, except that changes in the NSSP manual claimed to discriminate against treaty shellfishing activities may be challenged on that ground. Nothing in this Agreement shall preclude a tribe from enacting ordinances or adopting regulations more stringent than the NSSP standards.

## B. Independent Tribal Shellfish Sanitation Control Agencies

A tribal government may undertake sole responsibility for shellfish sanitation in its treaty shellfishing activities. A tribe having sole responsibility for shellfish sanitation shall be responsible for ensuring compliance in treaty fishing activities with the NSSP Manual, both Parts I and II. The state will have no responsibility for licensing, certifying or inspecting such activities or any shellfish operation of such a tribe, for the purposes of shellfish sanitation. The state also will not conduct any shellfish sanitation enforcement as to such treaty shellfishing. Such tribe could undertake independent classification of growing areas within its usual and accustomed areas, consistent with the concurrent jurisdiction provisions of this Agreement, provided that such tribe may not undertake such classification as to any bed staked or cultivated by citizens unless afforded access to the bed by agreement of the owner or lessee. A tribe in this category is not subject to Parts II, III, §§ B–F, V, VI and the Appendix to this Agreement, but may choose to participate in any of the joint technical/protocol development, enforcement, or other intergovernmental measures provided for in those sections.

The tribes agree that before undertaking sole responsibility, approval will be obtained from the appropriate office of the United States Food and Drug Administration ("FDA") for the tribe's independent shellfish sanitation program ("SSCA"). FDA's approval will be based upon a tribe's ability to meet the standards set forth in the NSSP Manual. In addition to facilities, staff, and other resources of a tribal organization, a contractor, or consultant may be relied upon to establish a tribe's qualifications to act as an independent shellfish sanitation control agency.

The parties recognize that a tribe's status as an independent shellfish sanitation control agency may present questions related to concurrent jurisdiction over growing areas from which both tribal and nontribal harvest is permitted. Questions will

relate, for example, to initial classification, reclassification, and monitoring of growing areas and response to actual or perceived emergencies. As part of any tribal request for recognition as an independent shellfish sanitation control agency, the state and tribe shall present either a joint proposal to FDA for addressing these jurisdictional questions or a statement of their respective positions on disputed jurisdictional questions. Disputes over whether a particular matter raises a meritorious claim of jurisdiction may be submitted for federal court resolution. Where the state and tribes agree or the court determines that concurrent jurisdiction exists, disputes regarding the appropriate coordination or exercise of such jurisdiction for public health protection shall be resolved through the mechanism described in Part VIII, § A.3 of this Agreement. Any jurisdictional question identified after the approval of a tribe as a SSCA, which for whatever reason, was not addressed earlier shall be addressed and resolved by the state and tribes and submitted to FDA using the same procedure applicable to an initial request for recognition.

## C. Development And Expansion Of Intergovernmental Shellfish Sanitation Programs/Technical Assistance

The state shall seek funding for a well-qualified individual who would be employed by the state for the purpose of assisting the tribes in developing expertise in matters of public health and shellfish sanitation. When funding for this position becomes available or is reasonably anticipated, the state will provide the tribes with a list of qualified individuals who have public health expertise and, more specifically, expertise with respect to shellfish sanitation. The state, in consultation with the tribes, will select from this list one person whose responsibility would be to advise the tribes with respect to public health and shellfish sanitation. This individual will be a state employee and the state will provide this individual's salary and benefits for a period of five years. It is contemplated that this individual would be officed in a tribal facility such as the Northwest Indian Fisheries Commission (NWIFC) office and will prioritize his or her activities as determined by the tribes. During this time, those tribes desiring to take responsibility for shellfish sanitation matters will seek funding and/or other necessary support to hire and integrate into their tribal shellfish programs persons with experience in public health and shellfish sanitation matters. The state may seek additional funding for the purpose of assisting the tribes in developing expertise in matters of public health and shellfish sanitation.

The state will provide additional technical assistance to tribes wishing to increase their expertise in matters of public health and shellfish sanitation subject to resource constraints. Examples of technical assistance include training, agreements for use of state laboratory facilities and access to state data, and advice regarding program design and operation.

It is recognized by the parties that the personnel infrastructure necessary for a comprehensive shellfish sanitation program, the wide array of technical expertise, and laboratory support facilities would be more easily attained through intertribal cooperation and sharing of resources. In establishing the tribes' abilities to accept varying degrees of responsibility leading to being recognized as independent tribal SSCA's, the pooling of tribal resources and expertise shall be considered consistent with the provisions of this Agreement and is encouraged.

The tribes and state agree to establish regular meetings, at least on a quarterly

basis, to discuss shellfish sanitation matters of concern, exchange information and knowledge, and identify and implement mechanisms to further their cooperative, intergovernmental approach, consistent with this Agreement.

Tribes shall be notified of and may participate in all formal FDA and state shellfish sanitation training programs. The Department of Health will use its best efforts to gain FDA approval of a state laboratory certification officer. Upon application, the state's lab certification officer will determine whether the applicant's laboratory meets the requirements of Part I of the NSSP Manual. This shall not preclude FDA certification of a tribal laboratory.

## II. LICENSING, INSPECTION AND CERTIFICATION FOR INTERSTATE AND INTRASTATE SHIPMENT

Any state or tribal licensing or certification decision regarding a tribal or individual tribal operation and relating to shellfish sanitation shall be consistent with this Agreement. The State agrees that, for the purpose of complying with this Agreement, a tribe may license individual tribal members and nonmember assistants to harvest, and to sell the shellfish they have harvested, under the tribe's state license and certification number, provided that the licensing of nonmember assistants complies with the ruling of the court in *United States v. Washington,* 384 F.Supp. 312, 412 (W.D.Wash.1974) (Ruling on Fisheries' Question No. 20).

## A. Tribes May Assume Primary Responsibility For Individual And Tribal Shellfish Operations

Although not approved as an independent shellfish sanitation control agency, a tribe may assume primary responsibility for the inspection and licensing of shellfish operations subject to its jurisdiction by obtaining FDA recognition that a tribal employee, consultant, or agent satisfies the qualifications for becoming a "standard," in accordance with FDA procedures, and as provided in the NSSP Manual. Such responsibility includes responsibility for ensuring compliance of individual tribal harvesters and tribally authorized shellfish dealers with Part II of the NSSP Manual. This Agreement provides for the recognition of such tribal standards. This provision, the parties agree, is a step toward tribal autonomy with respect to the regulation of shellfish sanitation. This provision also reduces burdens on the state with respect to routine inspections. The standard shall have the education and experience described in the Appendix, Attachment F.

The standardization requirement may be satisfied by the standardization of a qualified employee, consultant, or agent of a tribal organization or other entity from which it may obtain the required evaluation services.

A "standard" who is to provide evaluation services to a tribe must satisfy all requirements of the FDA or the NSSP which apply to state standards, including but not limited to periodic reevaluations, unless FDA determines that a particular requirement, or requirements would impair a tribe's ability to undertake primary shellfish sanitation responsibility and can be waived without compromising public health protection. A standard shall not have any inspection authority as to an operation in which he or she has any proprietary or financial interest, employment relationship or managerial responsibility.

Tribes under this Part II § A agree to obtain a state shellstock shipper or shucker/packer license and certificate of approval and state certification to the FDA for

inclusion on the Interstate Certified Shellfish Shippers List (ICSSL) provided that such licensing and certification shall be deemed a voluntary division of responsibility in furtherance of establishing cooperative, intergovernmental shellfish sanitation programs. Tribes and individual tribal operations obtaining a state license and certification pursuant to either this Part II, § A or the following Part II, § B shall not thereby become subject to any state shellfish sanitation laws, regulation, or enforcement authority, except as expressly provided in this Agreement.

The state will not license individual shellfish operations within the jurisdiction of tribes under this Part II, § A. The names of the individual shellfish operations will appear separately on the ICSSL. Individual shellfish operations within the jurisdiction of tribes, for purposes of this Agreement, means any shellfish operation within the territorial jurisdiction of the tribe, in which the tribe or any tribal member(s) own an interest in excess of 50% and exercise actual management control. The tribe shall notify the state of all such individual shellfish operations. In licensing individual shellfish operations, the tribe may retain direct responsibility for compliance with specific components of Part II of the NSSP Manual.

The "standard" relied on by the tribe shall inspect, evaluate and, as necessary, initiate sanctions against any shellfish operation within the jurisdiction of the tribe. The standard will perform these functions in accordance with Part II of the NSSP Manual, as provided by tribal ordinance or regulation. The standard will advise the state and FDA of his or her inspection schedule and will provide copies of all inspection reports, as well as prompt notice of any adverse action taken in regard to a shellfish operation. A state and/or FDA standard will be permitted to accompany the tribal standard on any inspection. A state standard may independently conduct only such inspections as are reasonably necessary to audit the tribal program, pursuant to Part V of this Agreement. Any dispute over whether state inspections are reasonably necessary to audit the tribal program shall be subject to dispute resolution pursuant to Part VIII, § A.3.

## B. State to Exercise Primary Responsibility

The state will have primary responsibility for certain shellfish sanitation matters as to treaty shellfishing activities by any tribe not itself a shellfish sanitation control agency and not having primary responsibility for inspection and licensing as provided herein, unless the tribe notifies the state that the tribe chooses not to permit shellfishing for commercial purposes, does not itself engage in commercial shellfishing activities, and identifies effective tribal controls to prohibit subsistence and ceremonial harvests from being diverted to commercial use. Effective controls are described in Part III, § C of this Agreement. Primary responsibility means primary responsibility for ensuring compliance with Part II of the NSSP Manual. Accordingly, the state shall license, certify, and inspect operations over which it retains primary responsibility. The sanction, if any, against a tribe or individual tribal operation shall be limited to license denial, suspension, modification or revocation. Any action against a tribe shall be conducted as a dispute resolution pursuant to Part VIII, § A.3 of this Agreement with those responsible for dispute resolution having the power to deny, suspend, modify or revoke the tribal license. License actions against individual tribal operations shall be conducted under the state administrative process.

## C. Tribal Certification—Compliance with NSSP Manual Part II.

If the state believes any tribe employing an FDA recognized standard, or any shellfish operation subject to the jurisdiction of such tribe, is out of compliance with Part II of the NSSP Manual, the state shall so notify the tribe in writing, detailing the deficiencies. A reasonable opportunity to take corrective action shall be offered, consistent with Part II of the NSSP Manual. Where consistent with the findings of a tribal standard and with Part II of the NSSP Manual, the state may, for purposes of the FDA's Interstate Certified Shellfish Shipper's List, withhold or withdraw the certification of an individual shellfish operation within the tribe's jurisdiction, if the deficiencies are not corrected. The state may also initiate action under the dispute resolution provisions, Part VIII, to suspend, modify or revoke the license of any tribe employing an FDA recognized standard which fails, under this subsection, to comply or insure compliance with Part II of the NSSP Manual.

## D. License Fees

The state shall not charge a fee for licensing any tribal treaty or individual treaty shellfishing operation as provided for in this Agreement.

## III. SHELLFISH SANITATION CRITERIA AND MEASURES APPLICABLE TO TREATY SHELLFISHING ACTIVITIES

## A. Compliance With NSSP Manual Sufficient

The parties agree that compliance with the performance criteria and other satisfactory compliance provisions set forth in the NSSP Manual, with the terms of this Agreement, and with all applicable federal laws or regulations governing shellfish sanitation, is adequate to protect public health. The tribes agree to regulate their treaty shellfishing activities, either independently or in conjunction with the state as provided herein, to maintain such compliance. Except as expressly provided in this Agreement, the state will not apply its shellfish sanitation laws, regulations, or policies to the tribes or their members.

The Manual currently covers clams, mussels, oysters, and scallops. The state and tribes agree to develop, as necessary, a cooperative approach for health regulation of any shellfish species subject to the tribes' treaty right which is not covered by the NSSP Manual. This approach shall be consistent with and modeled after the approach taken herein with respect to clams, oysters, mussels and scallops. The approach shall provide for:

1) comparable opportunities for increasing, and ultimately establishing exclusive tribal shellfish sanitation control; this includes but is not limited to primary reliance on tribal licensing, inspection, and other regulation;

2) an application of state sanitation laws to treaty shellfishing which is limited to emergency situations and those situations where a tribe has not yet developed an effective program for protection of public health; such application shall not discriminate against treaty shellfishing activities;

3) joint development of regulatory protocols and decisions;

4) exclusive tribal enforcement over members where a tribe has its own regulatory system in place; and

5) intergovernmental cooperation.

The state and tribes shall use the process outlined in the Appendix, Attachment A to develop this approach, prioritized according to the level of health concern. Any disputes as to the state's legal authority in regard to species subject to the

tribes' treaty right and not presently covered by the NSSP Manual, including questions involving the impairment of treaty shellfishing rights, may be submitted to the federal court. Other disputes shall be resolved pursuant to the dispute resolution provisions of this Agreement. In the interim, if the state seeks to apply a state shellfish sanitation law to a treaty tribe, with respect to species subject to a tribe's treaty right and not covered by the NSSP Manual, the state shall seek the tribe's agreement including, where appropriate, voluntary agreement to state licensure, inspection and compliance with standards applied to non-treaty shellfishers. If the tribe objects, the state may submit the matter to the federal court for resolution, provided that Part III, § B. of this Agreement shall apply in the case of a health emergency.

**B. Emergencies—Additional Measures, Including Closures, Hay Be Applied To Treaty Shellfishing When Essential In Responding To A Health Emergency**

1. Notwithstanding any other provision of this Agreement, the state may take summary administrative action against the tribal operation including license suspension, closing of growing areas and seizure or recall of product, in the case of a health emergency. A health emergency is a situation involving an immediate danger to the public health requiring immediate action. The state may take only such action as is necessary to prevent or avoid the immediate danger to the public health and justifies use of the emergency action.

2. The state agrees that in the case of a health emergency it will notify affected tribes of the situation and will provide available, relevant data as soon as possible. Consistent with the gravity of the health threat and the need for immediate response, the state will provide affected tribes an opportunity for prior consultation and prior technical/policy review.

3. Health emergencies may occur, for example: where established shellfish sanitation standards such as paralytic shellfish poison levels are exceeded; where harvesting areas are implicated in human illness; in the case of a catastrophic polluting event of unknown impact such as floods and oil or sewage spills; where contaminants present unknown health risks as was the case with domoic acid; where commercial shellfish operations engage in the sale of shellfish from closed areas contrary to the provisions of this Agreement; or where a tribal shellfish operation fails to meet a critical standard as defined in Part II of the NSSP Manual.

4. The state shall defer to measures adopted by a tribe to address a health emergency, where such measures would effectively protect public health. Any tribe affected by the state's action in the case of an alleged health emergency may invoke the dispute resolution mechanism described in Part VIII, § 3 of this Agreement to challenge the appropriateness of the emergency measures, either before or after they are implemented, but such measures shall remain in effect until resolved otherwise through dispute resolution.

**C. Commercial Harvests From Closed Areas Shall Be Prohibited**

1. A closed area is an area from which commercial shellfish harvest is not permitted under the terms of this Agreement. Each tribe will prohibit commercial harvest from closed areas and the sale of shellfish from closed areas. Sanctions authorized by tribal law for violation of such provisions shall be sufficient to deter prohibited conduct. The state and tribes agree that any harvest for human con-

sumption from growing areas which are closed, based on a sanitary survey or marine biotoxin report, is undesirable. The state and tribes also agree that such harvest should be discouraged through educational or other means.

2. Consistent with subsistence needs for all relevant species, each tribe will impose restrictions or measures to prevent the unlawful diversion to commercial use of shellfish harvested for subsistence purposes. These could include subsistence bag limits, restricting subsistence harvest in closed areas to monitored conditions, or such other controls as are effective. The tribe shall provide the state specific descriptions of the tribe's restrictions and/or other measures for review and comment. It is agreed that the current tribal monitoring systems and controls described in the Appendix, Attachment I, represent examples of effective restrictions or measures. Sanctions authorized by tribal law for violation of provisions established under this paragraph shall be sufficient to deter prohibited conduct.

3. Tribes will notify the state shellfish sanitation program in advance of any ceremonial harvest from closed areas which does not comply in all respects with the limitations on closed area subsistence shellfishing. The ceremonial harvests will be subject to tribal controls similar to those enacted or adopted to prevent the diversion of subsistence harvest into the commercial market.

4. If after review and comment the state does not agree that the tribe's controls for ceremonial or subsistence harvest would be effective, the matter may be referred to dispute resolution.

5. Consistent with the limitations on the release of criminal record information and any other confidentiality requirements imposed under state law, the state shall timely notify the tribes of all citations and/or arrests for violation of RCW 69.30.110, and any other state law imposed to prevent the unlawful diversion to commercial use of shellfish harvested for noncommercial purposes, issued or made by Washington Department of Fish and Wildlife ("WDFW") officers and the disposition of those cases. Each tribe shall timely notify the state of all citations and/or arrests for violation of ordinances or regulations enacted or adopted under paragraphs (1), (2), and (3) of this section and the disposition of those cases, provided that the tribes shall not be required to submit information different in kind or with any greater degree of specificity or breadth of disclosure than the state submits to the tribes.

6. After reasonable notice and an opportunity to correct deficiencies, a state licensed tribe shall be subject to suspension or revocation of its license and certification for failure to reasonably prosecute tribal members for violation of ordinances and/or regulations enacted or adopted under paragraphs (1), (2), and (3) of this section or which fails to timely notify the state of arrests, citations and the disposition of such cases. Any such action to suspend or revoke a tribe's state license shall be subject to dispute resolution as provided in this Agreement.

7. The state will not enforce the state's presumptive commercial limit as to the exercise of treaty shellfishing rights by any member of a tribe which complies with the regulatory and enforcement provisions set forth in paragraphs (1) through (5) of this section.

**D. Commercial Harvests From Closed Areas Permissible If Not For Human consumption**

Notwithstanding Part II, § C, tribes may engage in or authorize closed area

shellfishing for bait, seed, or other use which does not involve human consumption, consistent with the protocols referenced in the Appendix, Attachment B. Consistent with the protocols presently developed or developed in the future, and referenced in the Appendix, Attachment A, a tribe, prior to doing so, shall prepare and submit a plan to the state for review and concurrence. The state shall complete its review of the plan within 30 days after receipt.

### E. Joint Identification And Development Of Protocols, Standards And Other Guidance For Implementation Of The NSSP Manual

The state and tribes have identified certain elements of the NSSP Manual which they believe require agreed approaches to implementation. These include, among others, standards regarding short-term relays, the placement of sanitary lines, bait and seed harvest, and training requirements. Such shellfish sanitation considerations are addressed in the Appendix to this Agreement, which Appendix is incorporated herein by reference.

The Appendix contains protocols for certain matters and procedures and timetables for completion of others. The state and tribes, by agreement, may alter, expand, or limit the measures, protocols, or other provisions set forth in the Appendix, other than Attachment A.

### F. Growing Area Classification/Certification

The state and tribes agree that growing areas shall be classified and certified according to criteria set out in section C and other applicable portions of Part I of the NSSP Manual. Conditionally restricted and conditionally approved classifications will be utilized according to protocols agreed to by the state and tribes, which

recognize budget limitations. The adoption of additional or more specific criteria and measures to implement the Manual shall be by joint agreement of the state and tribes, pursuant to Part II, § E above.

The state will not, as a prerequisite to growing area classification, require a tribe to demonstrate ownership, leasehold interest, or permission from any owner, lessee, or land manager, of a growing area within the tribe's usual and accustomed areas and any portions thereof which are not "beds staked or cultivated by citizens" as adjudicated or as agreed to by the affected parties including any affected landowners. Nor shall any review and concurrence as to a non-health related matter, such as fish resource use priorities, be a condition of such classification. The state may otherwise continue to request a demonstration of ownership or landowner permission as a prerequisite to growing area classification. It will be the responsibility of the tribe to resolve any challenge to its treaty right in a particular growing area. The state may postpone action on a classification application until the dispute is resolved.

Tribal applications for the classification of new growing areas will be treated separately from nontribal applications for purposes of prioritization. The state agrees to set aside at least 50% of funds and other resources available for the classification of new growing areas for use in acting on tribal applications for the classification or reclassification of growing areas. This percentage shall be reevaluated by the state and tribes at such time as any tribe is recognized by FDA as an independent shellfish sanitation control agency. The state and tribes agree to seek additional appropriations for classifying and restoring areas identified by the tribes. For the tribes, such funding efforts may focus on increasing the ability of the tribes to gather the data and develop the evaluative

expertise for classification and restoration. By joint agreement among the tribes, the tribes will develop criteria for prioritization of tribal applications and identify a priority ranking, provided that, if the tribes fail to reach agreement on such ranking at a particular time, the state shall proceed to act on the applications by random selection among such tribal applications as have been filed with the department.

Before initially classifying a growing area or changing a growing area classification, the state shellfish program will notify affected tribes of facts indicating that a classification may be appropriate or a classification change may be necessary. The state and tribes will jointly determine a time period for collection of pertinent information and analysis consistent with the protocol for data collection and analysis developed as indicated in the Appendix, Attachment A, Group 2(d). Following such analysis, the state shellfish program will draft a proposed classification decision and submit the draft to all affected tribes for review and comment. The tribes will provide review and comment on a proposed classification decision, if any, within thirty days.

Where an immediate downgrade in classification, or a closure, is required by the NSSP Manual because of a failure to meet the minimum classification criteria of the NSSP, and where such failure does not constitute a health emergency as defined in Part III, § B of this Agreement, then the action required by the NSSP shall be taken. Prior to the action and at the earliest possible time, the state will notify affected tribes of the action and of facts the state believes demonstrate the need for the action under the NSSP. Within ten days of the action and as expeditiously as possible, the state and affected tribes will consult regarding the action and shall

jointly determine the need and the time period for further investigations to confirm the failure to meet NSSP criteria. The state and tribes may agree to extend this period as appropriate. Thereafter, the downgrade or closure decision shall be subject to dispute resolution as provided in Part VIII of this Agreement. Any immediate downgrade in classification, or closure, which is required by the NSSP Manual because of a failure to meet the minimum classification criteria of the NSSP and which also constitutes a health emergency as defined in Part III, § B of this Agreement, shall be handled as such an emergency under Part III, § B.

Any final decision regarding an initial classification or reclassification shall reflect a thorough consideration of all information and analysis supplied by a tribe and tribal comments, which have been timely submitted.

Plans and procedures for water sampling, shoreline surveys, monitoring, and other investigative work related to the classification, reclassification, restoration, or monitoring of growing areas subject to tribal harvest shall be jointly developed and agreed upon by the state and tribes. Any tribe who wishes to participate in such investigative work may do so in accordance with the agreed plans and procedures. Such participation will be encouraged and shall be a joint and cooperative process between the tribe and state, conducted through mutual consultation and sharing of expertise. Any tribe who wishes to conduct any water quality studies or shoreline surveys, other than shoreline survey on private land outside the tribe's reservation boundaries, may do so in accordance with the agreed plans and procedures and consistent with the expertise and training requirements provided in the Appendix, Attachments G and H. Tribes conducting shoreline surveys on private lands outside

their reservation boundaries will do so only in conjunction with state or county health officials. Both the state and tribes may audit the investigative work performed by the tribes for compliance with the NSSP Manual.

The state or a tribe will notify affected parties to this Agreement of its intent to conduct investigative work referenced in this Agreement at least one week prior to conducting such work. The state or a tribe planning to conduct such work will notify affected parties to this Agreement of any change in circumstance requiring deviation from the plan or schedule. A telephone call shall be sufficient notice for purposes of this paragraph. Tribes who do not wish to participate in routine growing area monitoring shall advise the state that notice to them of routine monitoring is not necessary.

## IV. EXCHANGE OF REGULATIONS AND DATA/REPORTING ILLNESSES

Except as to the issuance of regulations for emergency purposes as described in Part III § B of this Agreement, the state and tribes shall distribute among themselves for review and comment any proposed new or amended provisions of their shellfish sanitation laws or guidance. At least thirty days will be provided for review and comment of a draft. At least fifteen days will be provided for review and comment of a final proposed shellfish sanitation law or guidance. The state and tribes will also distribute any shellfish sanitation data among themselves upon request. FDA will provide the tribes copies of all NSSP Manual interpretations and Manual updates.

Consistent with applicable confidentiality requirements, the state and tribes will immediately report to all parties to this Agreement information, within their pos-

session, regarding any shellfish-related, human illness.

## V. STATE AUDIT OF TRIBAL PROGRAMS

The state may audit the shellfish sanitation activities of tribes to evaluate compliance with this Agreement. Such audits shall consist of periodic or occasional inspections of facilities, places, or records, or interviews with persons responsible for shellfish sanitation activities.

Where audit activities are conducted in person, the state auditor shall, prior to or upon arrival, identify himself or herself to the person in charge of the facility, place, or records, and notify the tribal shellfish sanitation contact identified pursuant to Part VII of this Agreement. The tribal contact or his or her designee shall have the right to accompany the auditor(s). The audit need not be delayed due to the unavailability of the tribal contact or designee. Promptly upon request, the tribe shall be provided a copy of all field notes, reports, findings, conclusions, and written criteria produced during an audit or used by the state to audit tribal compliance with this Agreement.

## VI. ENFORCEMENT

A. Nothing in this Agreement shall be construed to enlarge the authority of state officers on reservations and any Indian trust lands. Nothing in this Part VI shall be construed to pertain to, restrict or alter the enforcement of laws other than the shellfish sanitation laws of the parties.

B. Each tribe shall bear primary responsibility for enforcement of shellfish sanitation laws against its members and shellfishing permittees within its reservation, any tribal trust lands, or within the tribe's usual and accustomed areas. To the full extent permitted by applicable law,

each tribe shall also have primary responsibility against nonmember Indians within its reservation or on any lands held in trust for the tribe or its members. Any tribe may, at its discretion, refer to the state for prosecution in state courts any violation of tribal law which is also a violation of state law.

C. The state shall bear primary responsibility for the enforcement of state shellfish sanitation laws against: 1) non-Indians; 2) any Indian where the violation occurs outside of any Indian reservation, Indian trust lands, and outside the usual and accustomed fishing places of the tribe of which the violator is a member; and 3) nonmember Indians within a tribe's reservation or on any lands held in trust for the tribe or its members when, under applicable law, such nonmembers are not subject to the jurisdiction of the tribal court and jurisdiction lies with the state.

D. It is the intent of the state and tribes that, notwithstanding the existence of comparable laws of the State of Washington, and unless provided to the contrary elsewhere in this Agreement, violations of tribal shellfish sanitation laws by members of tribes or by tribal licensees shall be prosecuted in tribal courts.

E. If an enforcement officer of either the state or a tribe finds a person subject to the primary enforcement responsibility of the other entity, under Part VI, § B or § C, to be in violation of the bag limits, growing area closures, or other shellfish sanitation laws of the entity having primary responsibility, the discovering officer shall contact a law enforcement officer of the entity primarily responsible using common means of law enforcement communication such as radio over common frequency, telephone, or use of a dispatcher utilized by the party having primary responsibility. The officer having primary responsibility shall take such action regarding the offender and any associated evidence or forfeitable property as he or she deems appropriate, including arrest, citation, or requesting the discovering officer if authorized under applicable law, to detain or continue to detain the violator and to seize or retain specified evidence or property pending the arrival of the officer having primary responsibility. A state officer may hold or seize any shellfish grown, harvested, transported, shipped, processed, or sold by a treaty tribe member in violation of this Agreement.

F. If an officer having primary responsibility under this Part VI cannot be contacted within a reasonable time (not less than 30 minutes), the discovering officer will take the minimum action within his or her authority which is needed to protect officer safety and to prevent the loss or destruction of evidence or of forfeitable property. Notwithstanding the previous sentence, the discovering officer shall not detain an individual longer than is allowed under the search and seizure law of the jurisdiction having primary responsibility. The officer shall, as soon as practicable, refer the matter to the enforcement supervisor of the entity having primary responsibility for prosecution under this section, together with a statement of probable cause, any physical evidence or property held or seized and not destroyed, and the custody of any persons held in connection with the violation.

G. If a tribe does not have a regulatory prohibition against an activity which is in violation of the Agreement and led to a hold or seizure under § E. of this Part, the state officer may take appropriate action with regard to the product as provided by applicable state law.

H. The state and tribes shall maintain a proper chain of custody of all evidence and proper receipts for any forfeitable property.

I. The enforcement entity having primary jurisdiction shall notify the enforcement supervisor of the discovering party, in a timely manner, of any hearing or trial date which the discovering officer must attend. The discovering entity shall make its officers available for hearings and trial, and shall provide reasonable cooperation in the prosecution.

J. Where any entity has commenced a civil, criminal, or administrative enforcement action arising from a violation within the primary jurisdiction of another entity, dismissal shall be requested upon notice that the entity having primary jurisdiction has commenced an action in its own jurisdiction against the same offender and for the same incident.

K. Within a reasonable time after referral of a violation, and at least semiannually, the entity having primary responsibility shall, consistent with confidentiality requirements, notify the referring entity of the status or disposition of all referred cases, including whether and what charges were filed, the amount of any fines, and the nature of any other penalties, including permit suspension or revocation, restrictions, or probation which were imposed.

L. If the entity with primary responsibility does not initiate a prosecution within a reasonable time, not less than ninety days, following referral, the referring entity, if authorized by applicable law and with the agreement of the entity having primary responsibility, may take such action under its laws, consistent with this Agreement, as it deems proper.

M. All net proceeds from the sale of confiscated property shall be delivered to the entity prosecuting the case, provided that, if more than one entity initiates the prosecution, such proceeds shall be delivered to the entity having primary enforcement responsibility for the offense.

N. The enforcement supervisors of the state and tribes shall meet as needed (at least annually for the first three years following the effective date of this Agreement, and thereafter at least every two years) to discuss matters related to implementation of this Agreement, including the exchange of information regarding violations, the training of officers, and the planning of joint patrols or other joint operations.

O. In addition to the cooperative procedures set forth in paragraphs (B) through (N) above, the state and tribes agree that cross-deputization of their fisheries enforcement personnel is desirable in order to augment their respective enforcement capabilities. "Cross-deputization" means the issuance of special commissions authorizing one entity's law enforcement officers to issue citations, make custodial arrests, and otherwise act as enforcement officers of the other entity, as specified in a cross-deputization agreement. Each tribe agrees to deputize WDFW enforcement officers to enforce tribal prohibitions on commercial harvest from closed areas, tribal bag limits, and other tribal shellfish sanitation laws adopted pursuant to Part II, § c above, provided the following conditions are met:

1. The WDFW officer satisfies the minimum criteria (other than tribal membership criteria, if any) required to be commissioned as a fisheries enforcement officer of that tribe; and

2. WDFW agrees to deputize fisheries enforcement officers of that tribe to enforce state shellfish sanitation statutes and regulations.

WDFW shall not require, as a condition precedent to deputizing tribal officers, that those officers meet any more stringent criteria than are required to be a commissioned WDFW enforcement officer.

The state and tribes agree to use their best efforts to develop, within eighteen months after the effective date of this Agreement, a form of cross-deputization agreement that will specify procedures and requirements for cross-deputization, consistent with the terms of this Agreement, provided that tribal officers, under such agreement, are required to meet the minimum criteria required of commissioned WDFW officers and further provided that such agreement addresses the liability concerns of the state and tribes to their mutual satisfaction.

## VII. NOTIFICATION

To comply with the various notice provisions of this Agreement, each tribe that is a party to this Agreement shall designate an individual and an alternate who shall serve as the state's contact for purposes of notification. The state and FDA likewise shall each designate an individual and alternate who shall serve as the tribes' contact for notification purposes. Written notice to one or the other of the identified individuals shall be construed as sufficient notice under this Agreement. Facsimile transmission may be used, so long as it is followed by delivery or mail of the original.

## VIII. DISPUTE RESOLUTION

### A. Matters reviewable

Except where an alternative dispute resolution mechanism is expressly provided for in other sections of this Agreement, including the Appendix attached hereto, this section shall govern the resolution of all disputes arising from the implementation of this Agreement. Any reference to dispute resolution in a particular section of this Agreement shall not be construed to limit the availability of dispute resolution as to other matters.

The parties recognize three kinds of disputes potentially arising from the implementation of this Agreement: first, those involving legal issues such as determinations of jurisdiction or interpretation of state or tribal law or of this Agreement; second, those involving the interpretation of NSSP Manual compliance standards; third, those involving the administration of shellfish sanitation programs and of this Agreement, both through the development of policies and through the application of regulatory standards in case specific situations. The parties recognize that it may, in some cases, be difficult to characterize such disputes as arise. The parties therefore acknowledge and agree that, whenever a party initiates one of the three dispute resolution mechanisms described hereunder, it shall be the right of the responding party, at the threshold, to contest the characterization of a dispute and to seek its transfer to what the responding party considers the most appropriate forum.

1. Any party to this Agreement may invoke the jurisdiction of the federal court to resolve legal issues related to the implementation of this Agreement, provided that the tribes will not challenge in court the application of the terms of this Agreement to them or their members as inconsistent with their treaty rights.

2. The FDA and the ISSC have established a mechanism for resolving ambiguities in the compliance standards set out in the NSSP Manual of Operations, using the Interpretations process. The state and tribes shall utilize this process to resolve any disputes involving ambiguities in the compliance standards set out in the NSSP Manual of Operations and the decision of the FDA shall be binding on the parties.

3. The parties recognize a difference between preliminary decisions involving the day-to-day administration of shellfish sanitation programs by the state or the tribes and which generally involve data

collection and preliminary analysis, and final decisions such as growing area classifications, which are based on such data and preliminary analysis. Unless provided otherwise in this or a subsequent agreement of the state and tribes, the dispute resolution process described hereunder shall be available with respect to decisions of the latter sort but not of the former. The dispute resolution process described hereunder shall also be available to review the propriety of generally applicable policies or procedures employed or proposed to be employed by the state or a tribe in the implementation of this Agreement; the failure of the state or a tribe to provide required notice to or to consult with another party; the failure of the state to follow tribally-determined growing area classification priority list; any decision of a tribe or the state, clearly made in violation of a specific prohibition or requirement of this Agreement; and any decision of a tribe or the state that would result in irreparable harm to the party seeking review. The dispute resolution process described hereunder shall also be available to resolve license actions taken by the state, as provided in this Agreement, and the decision maker shall have the authority, in such actions, to deny, suspend, modify, or revoke a license. A preliminary action not directly subject to dispute resolution shall be reviewable as part of a decision, based on such preliminary action, which is subject to dispute resolution.

4. The FDA and an independent tribal SSCA having a dispute involving satisfactory compliance with the NSSP Manual which has a direct public health significance may submit the dispute for resolution through the ISSC Unresolved Issue process, provided that, after completion of that process or in lieu thereof, a tribe may, at its option, request an informal hearing, under 21 C.F.R. Part 16, subject to judicial review in accordance with the federal Administrative Procedures Act.

## B. Dispute Resolution Committee

The state and tribes shall each appoint one individual having experience in public health and shellfish sanitation, to form the Dispute Resolution Committee. At the time of submission of a matter to dispute resolution, the state and the tribes shall each identify a qualified member. Upon agreement of the state and the tribes, either may appoint additional qualified members of the Committee to serve in a particular case.

The decisions of the Committee shall be by consensus and binding upon the state and tribes. The state or affected tribe may seek federal court review of any legal issues that remain unresolved.

In the event consensus is not reached, the state and/or affected tribe(s) may request FDA, within fifteen days after conclusion of the committee process, to provide technical assistance to resolve the matter. In disputes regarding satisfactory compliance with the NSSP Manual which have direct public health significance, FDA will provide such technical assistance to the Dispute Resolution Committee. The technical assistance shall consist of expertise in public health and shellfish sanitation and the application and implementation of the requirements of either Part I or Part II of the NSSP Manual, or both Parts, depending on which Part or Parts is at issue. The technical assistance will be made available as soon as possible. If within ten days after FDA receives the request, FDA has not provided such technical assistance, any party to the dispute resolution proceeding may invoke the master expert procedure in § C. below. Any party to the dispute may also invoke the master expert procedure when consensus has not been reached either prior to or

following the provision of technical assistance by FDA.

## C. Appointment of Master Expert

If the members of the Dispute Resolution Committee are unable to resolve a dispute by consensus, or if the state or any affected tribe is dissatisfied with the decision of the Committee, then such entity may, within fifteen days after the conclusion of the Committee process, give notice to FDA of its intent to utilize a master expert. FDA shall maintain a list of persons eligible to serve as a master expert, which persons shall be considered by FDA to have expertise in public health and shellfish sanitation and the application and implementation of the requirements of either Part I or Part II of the NSSP Manual, or of both Parts, depending on which Part or Parts are at issue in the dispute. In compiling the list, FDA shall seek suggestions from the tribes and the state, which may include FDA employees.

The state and affected tribe(s) shall select by agreement a person from the list to act as master expert in the dispute. An FDA employee will not be used as a master expert without agreement of FDA. FDA will select a person from the list, to act as a master expert if the parties cannot agree. A non-FDA master expert shall be reasonably compensated by the non-prevailing party, provided that if the master expert's decision is reversed, the party prevailing on appeal shall be reimbursed by the opposing party for compensation paid the master expert. The master expert shall be authorized to make a decision binding on the state and affected tribes. FDA will receive notice of the decision. FDA will have thirty days to review the decision before it becomes final and shall make, in writing within the thirty-day period, any objection it has to the decision. The master expert will be responsible for

keeping minutes of any dispute resolution proceeding in which he or she is involved.

Any party aggrieved by the master expert's decision or aggrieved by FDA's objection to the master expert's decision, shall have the right to appeal, within thirty days, either determination to the federal court, or as otherwise provided by law.

## D. Review Procedure

Disputes shall be submitted for review by a brief, written statement setting out the points of disagreement and the submitting party's position and reasons. Within seven week days of delivering the statement to the decision maker(s)and to other involved parties, any other involved party may submit a written response, briefly stating its position and the reasons. The parties shall be provided an opportunity for an oral or telephonic presentation and submission of supporting documents. A written decision shall be issued within 30 days after the submission was received, provided that a decision may be postponed for a reasonable period of time to obtain additional information that is likely to aid in resolving the dispute. In an emergency, the decision may be delivered orally, with a written memorandum of decision issued shortly thereafter. In the event a matter involving an emergency has been submitted, the matter shall be determined as expeditiously as possible but no later than 3 business days after receipt by the body issuing the decision.

The Committee or the master expert may adopt such additional review procedures as they deem appropriate, so long as adopted in consultation with the state and tribes and so long as consistent with the provisions of this Agreement. Within 180 days following Court approval of this Agreement, the Dispute Resolution Committee shall prepare and disseminate to the state and tribes for their comment a

document setting forth the review procedures contained in this Agreement and any additional, generally applicable procedures adopted.

In the alternative to any other means of dispute resolution authorized by this Agreement, and absent objection by any interested party, a party may invoke the processes of the ISSC to resolve the issue.

## IX. CONSISTENCY OF AGREEMENT WITH NATIONAL SHELLFISH SANITATION PROGRAM/ANTI–DISCRIMINATION PROVISION

In agreeing to this settlement, the United States, through the Federal Food and Drug Administration, confirms that the cooperative, intergovernmental shellfish sanitation programs provided for, and the other divisions of responsibility and authority contained herein, do not conflict with the National Shellfish Sanitation Program or current provisions of federal law applicable to shellfish sanitation. Compliance with this Agreement will not jeopardize FDA certification of the state or tribal programs or be the cause for any federal punitive action. The FDA specifically agrees not to sanction the state for any difference in the way the state treats tribal and nontribal shellfish operations, so long as such treatment is consistent with this Agreement. The FDA further agrees to counsel member states of the Interstate Shellfish Sanitation Conference (ISSC) against imposing any barrier to interstate commerce of shellfish harvested in Washington State, whether by tribes or others, because of this Agreement.

## X. AMENDMENTS

The parties recognize that individual tribes, groups of affiliated tribes, the tribes collectively, the state or the FDA' may wish to amend this Agreement or to reach new agreements governing shellfish sanitation and, to that end, any of these entities or groups may propose an amendment for consideration by the parties. Unless the parties agree otherwise, or a compelling reason exists for more frequent amendment, proposed amendments shall be considered at an annual meeting to review the parties' progress in implementation.

Until an amendment or a new agreement is adopted by the parties, and court approval is obtained where required, this Agreement shall be binding.

## XI. INTENT TO BIND POLITICAL SUBDIVISIONS, ETC.

It is the desire of the parties to this Agreement that it shall bind all agencies, officers, boards, commissions, and political subdivisions of the parties to the greatest extent allowed by law. It is the position of the state, however, that it may lack authority to bind all its political subdivisions and, in particular, local law enforcement and prosecutors. The state shall provide a summary and a copy of this Agreement to county prosecutors, county sheriffs, and local health jurisdictions in waterfront counties and make every reasonable effort to ensure that they will conform their actions to the agreed upon scope of state authority. Nothing in this Agreement shall be deemed to bar a tribe or its members from challenging local enforcement based on treaty right violations as well as other grounds, if it exceeds the state's authority under this Agreement.

## XII. JUDICIAL APPROVAL

This Agreement shall become effective upon signature of the authorized representatives of the parties and approval of the Court in *United States v. Washington*, Subproceeding 89–3. This Agreement is not intended and shall not be construed as the admission of any party, as findings of

fact, conclusions of law, or the interpretation or construction of the law applicable to this case. No party shall be considered to have prevailed with respect to resolution of this issue or shall be entitled to its costs or fees.

## APPENDIX

### Attachment A

#### Group 1

With regard to each of the following activities, the state and tribes will adhere to the protocols set forth in the designated attachments to this Appendix, as agreed mechanisms for implementing the Agreement and the NSSP Manual:

a) Harvest from closed areas for bait or other use which does not involve human consumption, Attachment B, (Bait and non-consumptive use Protocol);

b) Short-term relay, that is, relay in which shellfish are held in approved waters for a period of 60 days or less, Attachment C, (Short-term Relay Protocol);

c) Location of sanitary lines at the boundaries of areas having different growing area classifications pursuant to Part I of the NSSP Manual, Attachment D, (Sanitary Line Protocol);

d) Establishment of prohibited areas surrounding marinas and point source discharges of sewage or other contaminants, Attachment E, (Point Source and Marina Closure Protocol);

e) Procedures and requirements for approval of. state or tribal agents as "standards" for the implementation of Part II of the NSSP Manual, Attachment F; and

f) Minimum qualifications for personnel conducting shoreline surveys and water quality studies, Attachment G.

#### Group 2

For the following activities, there is a need to jointly develop protocols which will insure compliance with the NSSP:

a) Long-term relay, that is, relay in which shellfish are held in approved waters for a period of more than 60 days (Long–Term Relay Protocol);

b) Harvest from closed areas for seed, (Seed Harvest Protocol);

c) Depuration; and

d) Data collection and analysis for purposes of growing area classification.

The state and tribes, through the Technical Team established below, will make their best efforts to develop the protocols in this category within two years following their execution of this Agreement and its approval by the Court. The Technical Team shall meet at least once each quarter following approval of this Agreement, according to a schedule to be developed by the Team. If the Team fails to agree on a draft protocol within two years, any party who has participated in the Team may invoke the dispute resolution procedures of this Agreement.

#### Group 3

In addition to those matters identified in groups 1 and 2 above, additional matters may come to the attention of the parties, as to which there may be a need to develop policies or protocols, in order to implement and comply with the NSSP Manual, consistent with the principles of this Agreement. The parties also recognize that retail food service regulation for public health protection is another matter which may need to be addressed as to off reservation treaty shellfish activities. If in the future, the NSSP Manual is amended to provide for additional standardized processes other than growing area classification, the parties will develop protocols to provide the

tribes an opportunity to obtain standardization with respect to those processes. At such time as the parties may agree, but at least every two years, policy representatives designated by each party shall meet and identify any such matters, which shall be referred to the Technical Team for action. The first such policy meeting shall occur no later than eighteen months after the effective date of this Agreement. Additional such matters may be referred to the Technical Team at any time by agreement of the state and one or more tribes.

Technical Team

Each tribe or group of tribes will identify a technical representative, and the state will identify one or more technical representatives, who shall constitute the Technical team. The purpose of the team is to cooperatively assemble and evaluate information regarding shellfish sanitation, and to develop proposed policies and protocols, based on sound scientific and statistical methods, to be presented to policy representatives of the parties for approval.

The Team may in its discretion appoint working groups, coordinators, or other officers, and may adopt a work plan and any procedures it deems useful. Decisions of the Team shall, where possible, be made by consensus and within 30 days after a matter is presented for consideration. Where consensus cannot be achieved, the Team shall present majority and minority reports to the parties' policy representatives for consideration. Issues which cannot be resolved by agreement of the parties' policy representatives shall be referred to dispute resolution under this Agreement.

Draft protocols and guidance based on scientific method, developed by the Team, shall become effective as to any tribe upon approval by such representatives of that tribe and of the Washington State Department of Health.

Attachment B

## SHELLSTOCK HARVEST FOR BAIT

### PROPOSED REQUIREMENTS

— Any person desiring to harvest molluscan shellfish for use as bait must first obtain a permit from the state or tribal regulatory authority.

— Bait harvest shall only be allowed in designated areas at specified times.

— Bait shellstock shall be dyed with an approved dye, such as FD & C # 1 Blue, before being transferred from the harvest area, unless the shellstock remains under direct regulatory supervision until dyed. Such shellstock shall be labeled "NOT FOR HUMAN CONSUMPTION–BAIT USE ONLY." Bait shellstock shall be stored in a location physically separated from product intended for human consumption.

— Bait shellstock must be completely immersed in dye to impart a visible color to the shellstock.

— All bait harvesting activities and dying of shellstock shall be done under immediate regulatory supervision.

— Complete records of all bait harvesting activities shall be kept, including harvest location, date, quantity, species, and distribution of product.

— Bait shellstock found in violation of these requirements shall be subject to immediate seizure and destruction.

Attachment C

## SHORT–TERM RELAYING PROTOCOL AND GENERAL REQUIREMENTS

The practice of relaying involves the harvest of shellfish from polluted waters and, therefore, strict controls over the harvest, transport, laying down, surveillance, and reharvest are necessary to prevent contaminated shellfish from entering commercial channels and posing the threat of shellfish-related disease outbreaks. In addition, significant resources are required to adequately monitor relay activities.

### Definitions

Approved Area: The classification of a shellfish growing area which has been approved by the state shellfish control agency (SSCA) for growing or harvesting shellfish for direct marketing. The classification of an approved area is determined through a sanitary survey conducted by the SSCA in accordance with Section C of Part 1 of the National Shellfish Sanitation Program Manual of Operations. An approved shellfish growing area may be temporarily made a closed area when a public health emergency resulting from, for instance, a hurricane or flooding, is declared.

Commingling: The act of combining different lots of shellfish.

Container: A container such as a bag, tray or float used to hold shellfish during the purification process.

Container Relaying: The transfer of shellfish from restricted areas to approved or conditionally approved areas for natural biological cleansing in a container using the ambient environment as a treatment system.

Department: The Washington Department of Health, Office of Shellfish Programs.

Harvester: A person who takes shellfish by any means from a growing area. A harvester may be a person, firm or corporation ultimately responsible for harvest operations.

Long-term Relay: A relay operation that utilizes purification times of more than 60 days.

Lot of Shellfish: A collection of bulk shellstock or containers of shellstock of no more than one day's harvest from a single defined growing area harvested by one or more harvesters.

National Shellfish Sanitation Program (NSSP): The cooperative program for the certification of interstate shellfish shippers as described in the National Shellfish Sanitation Program Manual of Operations, Parts I and II. Foreign countries may participate by having an effective agreement with the FDA.

Prohibited Area: State waters that have been classified by the state shellfish control agency as prohibited for the harvesting of shellfish for any purpose except depletion. A prohibited shellfish growing area is a closed area for the harvesting of shellfish at all times.

Reharvester: A person, firm or corporation who reharvests the purified shellfish after relaying. The Harvester/Reharvester may be the same or different entities.

Relaying: The transfer of shellfish from restricted areas to approved areas for natural biological cleansing using the ambient environment as a treatment system.

Restricted Area: State waters that have been classified by the state shellfish control agency as an area from which shellfish may be harvested only if permitted and subjected to a suitable and effective purification process.

Short-term Relay: A relay operation that utilizes purification times of 60 days or less.

State Shellfish Control Agency: The state agency or agencies having legal authority to classify shellfish growing areas and issue permits for the interstate shipment of shellfish in accordance with the provisions of the NSSP Manual of Operations, Parts I and II.

| Responsibilities of Parties | | |
|---|---|---|
| Dept. of Health * | Harvester | Reharvester |
| Classification of the growing area. | Complete and submit application. | Complete and submit application. |
| Review and approve the application by the harvester. | Submit Harvest Schedules. | Identify Relay Site. |
| Review and approve the application by the reharvester. | Identify harvest sites. | Maintain shellfish identification during relay. |
| Review and approve harvest and relay sites. | Properly label harvested shellfish. | Maintain records of placement and reharvest. |
| Coordinate harvest surveillance. | Maintain harvest records. | Record environmental measurements such as water temperature as required by DOH. |
| Assist in and approve verification studies, including design. | Submit samples as required. | Sample collection as required by DOH. |
| Collect and analyze samples. | Conduct harvest surveillance. | Relay site surveillance and security. |
| Interpret data. | | |
| Conduct water quality monitoring. | | |
| Review Records. | | |
| Facilitate regulation enforcement. | | |

## REQUIREMENTS FOR RELAYING SHELLFISH

### Administration and Permits

The harvester/reharvester must complete an application for a Shellfish Operation Licence and Certificate of Approval.

The harvester/reharvester must complete an Application for Relaying Shellfish. The application must be approved by the Department of Health. The relay permit shall run concurrently with the certification period (certificates expire on September 30). Copies of the relay application will be forwarded to other state agencies having an interest, such as the Departments of Fisheries, Natural Resources and Parks.

The Department shall respond to relay applications within 30 days of receipt.

* A treaty tribe may perform certain of these functions as provided in this agreement.

A harvest schedule, which includes specific dates and times of harvest, shall be submitted with the application. The Department must be notified of any changes to the schedule.

The method of deposition of laying down of shellfish at the relay site must be outlined and approved by the Department.

It should be recognized that conditions in the marine environment during certain times of the year may render the natural purification process and subsequent bacterial reductions ineffective. Low water temperature and salinities are the primary factors contributing to this effect. Therefore, the Department reserves the right to approve or deny relay permits on a seasonal basis.

Approval of the relay operation may be subject to cancellation due to failure to comply with these requirements or as a result of adverse conditions at either the initial harvest site or the relay area.

### Monitoring and Standards

The initial harvest site must be classified as Restricted or Conditionally Restricted. The relay site must be classified as Approved or Conditionally Approved.

A verification study shall be performed to show that the relay is effective in reducing bacteriological contamination (see Verification Study Procedures and Monitoring Requirements for Commercial Relay Operations).

The relay area must be at least 25 feet from adjacent, approved shellfish and may require greater separation as determined by the Department.

Shellfish samples from both the initial harvest site and the relay area shall be maintained and furnished to be Department as required.

### Surveillance: Short Term

A detailed surveillance plan must be submitted by the harvester/reharvester. It must specify surveillance activities to be performed by the harvester/reharvester to insure the security of relayed product for the duration of the relay. The surveillance plan will be evaluated and a determination will be made as to what Departmental resources will be expended on surveillance activities. The surveillance plan must be approved by the Department.

The initial harvest site must be well defined. It shall be the responsibility of the harvester to identify the site with appropriate markers as required by the Department.

The relay area must be well defined. It shall be the responsibility of the reharvester to identify the relay area with appropriate markers as required by the Department.

Site visits may be made by Department staff to both the initial harvest site and relay area.

The relay area must lend itself to effective surveillance.

The harvester shall be responsible for effective supervision and management of the harvest. Supervision shall include methods to insure:

1. Product is removed only from the designated harvest site.

2. Product is transferred exclusively to the approved relay site.

3. Records of harvesters and quantities harvested are maintained.

The reharvester shall be responsible for the effective supervision and management of the transport, laying down of the contaminated shellfish, relay site surveillance and security, and the reharvest of the purified shellfish.

The method and route from the initial harvest site to the relay site must be outlined and approved by the Department.

For container relay, harvest tags stating "For Relay Only" in indelible ink must be attached to each container of shellfish to be relayed.

## Records

All lots of relayed shellfish shall be identified by waterproof tags or labels throughout the relay process, including a specific number for each lot. However, bulk or ground relay can be marked with poles, pipes, or other suitable means.

Accurate, written records shall be maintained and submitted on a monthly basis or more frequently as determined by the Department. Such records must be available for inspection by the Department at any time.

Relaying records shall consist of initial harvest area location, initial harvest dates and quantities harvested, dates of placement in the relay area and quantities placed, relay area location, and dates of removal from the relay area and quantities removed.

## VERIFICATION STUDY PROCEDURES AND MONITORING REQUIREMENTS FOR SHORT TERM COMMERCIAL RELAY OPERATIONS

A verification study is required prior to approval of relay to determine if the process is effective in reducing bacteriological contaminants. This document sets forth the procedures to be used to establish relay effectiveness, as well as the monitoring requirements necessary for approved relays. Prior to initiating a verification study, the proponent must submit a completed relay application for review by the affected tribe and the Department of Health. Approval by the Department of Health of that application is required before the study is initiated.

1. Verification study procedures.

To determine relay effectiveness, at least two verification studies shall be conducted. Verification studies shall not run concurrently, but may be initiated one week apart. A decision as to the maximum length of time the study will be run must be made prior to initiating the test relay. Shellfish test lots that do not meet the required bacteriological endpoint will be destroyed or returned to the original harvest area at the conclusion of the verification study.

Verification studies shall be conducted as follows:

a. Sufficient shellfish shall be harvested from the restricted area to approximate commercial relay conditions. The same relay process (bags, trays, floats, etc.) shall be used in the study as is intended for the commercial operation.

b. Department or tribal staff will collect at least five representative 0-day samples from the restricted area for bacteriological analysis.

c. Department or tribal staff will collect at least five samples from the relayed product after seven days and five samples after fourteen days. An additional five samples will be collected at the endpoint of the relay if a prior decision has been made to proceed with a relay longer than fourteen days. Succeeding samples may be taken at a frequency determined by the Department and the tribes.

2. Evaluation of relay effectiveness. The endpoint relay samples shall be used to establish a geometric mean for each verification study. The fe-

cal coliform geometric mean of the endpoint relay samples shall not exceed 75/100 grams and no values shall be greater than 230 fecal coliforms/100 grams.

Both verification study lots must meet the required endpoint criteria for the relay to be approved. A decision as to whether to proceed with further verification studies in the event that the initial test relays do not sufficiently reduce contaminants shall require a comprehensive review of the proposed relay by the proponent, the Department and the tribes. All commercial relays will be required to run at least fourteen days unless sufficient data has been collected to show that a shorter time period will consistently reduce bacteriological contaminants to the required level. In no case will the required time period be reduced below fourteen days until the relay has successfully operated for at least six months.

3. Monitoring of approved commercial relays. In addition to sampling of relayed shellfish, additional water quality monitoring must be conducted at the relay site. Monthly water samples shall be collected in the relay area (at least three stations) to assure that approved area criteria are being met.

The first four lots of relayed shellfish shall be sampled at the relay endpoint (at least five samples per lot). Further monitoring will be conducted as determined by the Department and the tribes. If relay times of less than fourteen days are approved, each lot shall be sampled before relay and at the endpoint, until sufficient data has been collected to justify decreasing sampling frequency.

The permit to relay may be subject to cancellation if any test lot of relayed shellfish fails to meet the established endpoint criteria. A retest shall be conducted immediately if product exceeds endpoint standards. If the endpoint is exceeded in lot follow-up, an investigation will be conducted, after which a determination will be made if the relay should continue.

Attachment D

## PROCEDURES FOR ESTABLISHING SANITARY LINES IN SHELLFISH GROWING AREAS

Sanitary Lines are established in shellfish growing areas to define the location of the various harvest classifications recognized under the NSSP Manual. Factors considered in establishing such lines include the following:

— Prohibited areas around point source outfalls are established in accordance with criteria set forth in Part I of the NSSP Manual (see Attachment E.1–3 for details).

— Prohibited areas around marinas are established in accordance with criteria set forth in Part I of the NSSP Manual (see Attachment E–4–5 for details).

— All sampling stations within areas classified as approved must meet the coliform standard based on an annual review of data. Location of the sanitary line defining approved areas is also based on sanitary survey information which describes the location of actual and potential pollution sources and their impact on the growing area.

Sanitary lines are located such that they are easily identifiable (easily visible land marks, etc.)

— The location of shellfish resources is always taken into account when establishing sanitary lines and sampling stations to maximize resource availability.

— Sanitary lines defining conditionally approved areas are based on detailed studies showing the extent of potential impact of a particular point or nonpoint source(s) on the growing area. The sanitary line is placed such that all sampling stations that meet the coliform standard when the area is open to harvest are included in the conditionally approved area.

— In addition to microbiological data from marine sampling stations, consideration is given to hydrographic characteristics of the area in establishing sanitary lines.

Attachment E

### PROCEDURES FOR ESTABLISHING SANITARY LINES AROUND WASTEWATER OUTFALLS

The Shellfish Program of the Department of Health establishes Prohibited Areas around wastewater outfalls in accordance with the policy outlined in the NSSP Manual. The sections of the NSSP Manual of Operations Part I which describe the factors to be taken into consideration in the establishment of sanitary lines which define the appropriate Prohibited Area include Sections: C.2 (Classification of Growing Areas); C.3 (Approved Areas); C.4 (Conditionally Approved Areas); and C.7 (Prohibited Areas). It should be emphasized that a Prohibited Area is required adjacent to any wastewater outfall of public health significance.

As stated in recent revisions of the Manual, the effectiveness of wastewater treatment processes must be considered in establishing the appropriate classification of nearby shellfish production areas. In particular, the wastewater treatment must be evaluated in terms of the minimum treatment which can be expected with the possibility of malfunctioning, overloading, or poor operations. These evaluations are conducted by the DOH Shellfish Program on a site-specific basis, through technical "reliability" evaluations of the wastewater treatment facilities.

Several factors are taken into consideration by the DOH Shellfish Program in establishing the location of the appropriate sanitary lines for the Prohibited Area (and Conditionally Approved Area if applicable). The principle factors which involve operations in the treatment plant include:

— effluent volume at high and/or low hydraulic loading;

— bacteriological and physical quality of the effluent, and

— identification of factors which can cause plant failure.

In addition, the major hydrographic factors in the receiving waters which need to be taken into consideration include:

— current velocity;

— receiving area geometry;

— direction of travel and stratification;

— location of discharge;

— tidal characteristics;

— orientation and configuration of the outfall pipe and diffuser, and

— physical characteristics of the receiving water.

These factors which are listed above are usually used as input parameters in the CORMIX (Cornell Mixing Zone) modeling program, an Expert System approved by EPA for far-field modeling of effluent dispersion from outfalls. More infrequently, field studies using dye and/or drogues are

utilized by DOH in the establishment of sanitary lines for wastewater treatment plants. The selection of the most appropriate approach to be used is often a site-specific consideration, based on Best Professional Judgment. As stated in the NSSP Manual, the SSCA shall choose the most appropriate method in which to apply the factors previously described. These methods can include hydrographic field and/or computer models pertinent to the discharge and receiving water application. In addition, a reliability evaluation of the wastewater treatment plant should be conducted to ascertain the principle factors which involve operations at the plant and which affect the quality and quantity of its effluent.

Generally, the DOH Shellfish Program assumes that the bacteriological quality of the effluent is approximated under theoretical upset conditions at the wastewater treatment plant by that of the treated-but-not-disinfected effluent. This is a conservative assumption applicable to most plants evaluated by DOH, and has been previously suggested by FDA in outfall studies. It should be emphasized that the DOH Shellfish Program generally assumes adverse conditions at the plant and in the receiving waters, rather than worst-case conditions, in assuming a theoretical condition of malfunction or poor operation at the treatment plant. This approach is similar to that used by DOE in establishing dilution zones protective of aquatic life.

Hydrographic and receiving water information is usually obtained by DOH from a variety of sources. These sources include DOE-mandated mixing studies; ambient monitoring water quality data; as-built plans and field studies from the files of DOE, universities, the permittee, or consultants, and information collected by DOH and FDA. Adverse receiving water conditions are assumed in the CORMIX model iterations.

The sanitary line for a wastewater discharge is established at the location where the water quality is projected to meet the shellfish water quality standard of 14 fecal coliforms/100 ml. In certain situations, depending upon the location of the nearest shellfish resource, no Conditionally Approved Area may be needed to meet this criteria. In such situations, the water quality standard is required to be met at the edge of the Prohibited Area.

In other situations, a Conditionally Approved Area is required adjacent to the Prohibited Area. In these situations, the Prohibited Area serves to provide a transport or transit time, for notification of any plant upset to DOH. DOH is then responsible for notifying any commercial shellfish producers in the affected Conditionally Approved Area, and to temporarily close down harvesting of shellfish in the Conditionally Approved Area. The cooperation of the treatment plant operators and all certified growers in the Conditionally Approved area with DOH is required for this classification.

## PROCEDURES FOR ESTABLISHING SANITARY LINES AROUND MARINAS

The shellfish closure zones around marinas will be established in accordance with the policy outlined in the current NSSP Manual. As currently stated in the Manual of operations Part 1, Section C.9:

Determining the impact to adjacent waters will be based upon a dilution analysis for the marina which incorporates the following assumptions:

i. an occupancy rate of the marina;

ii. an assumed rate of boats which will discharge untreated water;

iii. an occupancy rate of two (2) persons per boat;

iv. a rate of discharge of $2x10^9$ fecal coliforms per person per day;

v. wastes are completely mixed in and around the marina;

vi. closure is based upon a theoretical calculated fecal coliform of 14 MPN per 100 ml; and

vii. closure is based on the volume of water in the marina.

These assumptions are incorporated into the shellfish closure zone analyses conducted for marinas by the DOH Shellfish Program. To facilitate and promote the application of these assumptions for specific marina evaluations, the DOH Shellfish Program uses the Virginia Institute of Marine Sciences (VIMS) computer model, which was obtained from FDA staff. The VIMS model incorporates the specific assumptions listed in the NSSP Manual in Section C.9.

The occupancy rate of a marina is deemed to be the actual (rather than potential) occupancy of the marina during high usage periods, unless a boat count is unavailable. The assumed rate of boat discharge generally applied in marina evaluations is: 50% for recreational craft in marinas without boat waste pumpouts; 30% for recreational craft in marinas that have boat waste pumpouts, and 10% for commercial boats or boats that have long-term moorage but are infrequently used or occupied. However, as noted in the NSSP Manual, site-specific considerations using Best Professional Judgment can and should be used by the SSCA with respect to sanitary significance relative to actual or potential contamination.

The shellfish closure zone for a marina may be seasonal in nature, based upon the high-use season evidenced at the marina.

For example, the high use season may be during fair-weather months of the year for recreational boats, or during commercial seasons for commercial craft. The sanitary line for the shellfish closure zone is established at the location where the model indicates that the water quality meets the standard of 14 fecal coliforms/100 ml.

Attachment F

## MINIMUM QUALIFICATIONS FOR STANDARDIZED SHELLFISH INSPECTORS

**STANDARDIZED INSPECTORS MUST HAVE A BACKGROUND IN PUBLIC HEALTH THAT INCLUDES EXPERIENCE IN INSPECTION ACTIVITIES AND A GENERAL KNOWLEDGE OF MICROBIOLOGY AS IT RELATES TO FOOD SERVICE SANITATION.**

### GENERAL REQUIREMENTS:

A Bachelor's degree in public health, environmental health or closely allied field and 2 years experience in a public health or environmental health position, including at least one year experience in food service inspection.

Specific training by the Food and Drug Administration and certification as a Standardized Shellfish Inspector is also required. This process includes classroom type instruction for a 4 to 5 day period and joint field inspection activities that may require several months to complete. Field verification inspections and other FDA required training is periodically necessary in order to maintain "standard" status.

### TYPICAL DUTIES:

Plans, organizes, and directs the shellfish dealer inspection program. Conducts inspections and determines compliance with national standards and state or tribal regulations as appropriate. Initiates enforcement action as needed. Provides technical review of plans for new construction or

remodeling of facilities. Serves as a consultant to shellfish dealers on matters relating to plant sanitation and handling of shellfish. Provides liaison and coordination with FDA, tribal, state and local agencies.

Attachment G

## MINIMUM QUALIFICATIONS FOR CONDUCTING WATER QUALITY STUDIES

WATER QUALITY STUDIES ARE A KEY COMPONENT OF GROWING AREA CLASSIFICATION THAT REQUIRE AN UNDERSTANDING OF INDICATOR ORGANISM BEHAVIOR IN THE MARINE ENVIRONMENT. PERSONS INVOLVED IN STUDIES MUST HAVE A WORKING KNOWLEDGE OF SAMPLING PROGRAM DESIGN, HYDROGRAPHICS, MARINE MICROBIOLOGY, AND THE FATE OF POLLUTANTS IN THE MARINE ENVIRONMENT.

PERSONNEL REQUIREMENTS FOR WATER QUALITY STUDIES:

WATER QUALITY LEAD WORKER: A Bachelor's degree in environmental or physical science, natural science, environmental planning, or other closely allied field and 2 years experience in environmental monitoring, environmental health or environmental planning. Specific training in water quality monitoring design, sampling procedures, and operation of watercraft is also required.

TYPICAL DUTIES: Plans, organizes and conducts water quality studies in shellfish growing areas. Establishes sampling stations, identifies growing area boundaries, and collects water samples and other environmental data. Organizes data and prepares reports of findings. Trains lower level staff in proper sampling technique, equipment operation, and boating safety procedures.

WATER QUALITY ASSISTANT: Previous experience as an environmental technician or field work related to one of the natural sciences and specific training in water sampling techniques and watercraft operation.

TYPICAL DUTIES: Assists the lead worker in conducting water quality studies in shellfish growing areas. Collects samples and environmental data and records information. Operates watercraft and other sampling equipment.

Attachment H

## MINIMUM QUALIFICATIONS FOR CONDUCTING SHORELINE SURVEYS

SHORELINE SURVEYS ARE A KEY COMPONENT OF GROWING AREA CLASSIFICATION THAT REQUIRE A THOROUGH KNOWLEDGE OF NONPOINT POLLUTION AND ITS IMPACT ON MARINE WATERS. PERSONS INVOLVED IN CONDUCTING THESE SURVEYS MUST HAVE A PUBLIC HEALTH BACKGROUND INCLUDING EXPERIENCE IN ENVIRONMENTAL HEALTH OR ASSESSMENT, AND A GOOD UNDERSTANDING OF ON-SITE WASTE DISPOSAL, POLLUTION TRANSPORT MECHANISMS, AND BASIC MICROBIOLOGY.

PERSONNEL REQUIREMENTS FOR SHORELINE SURVEYS:

SHORELINE SURVEY LEAD WORKER: A Bachelor's degree in public health, environmental health or allied science and 4 years experience in a public health or environmental health position, including at least 2 years of field experience evaluating nonpoint water pollution sources and 1 year evaluating or designing on-site sewage systems.

**TYPICAL DUTIES:** Plans, organizes and conducts the shoreline survey component of sanitary surveys in shellfish growing areas. Trains and directs lower level staff in conducting surveys. Evaluates completed survey documents and develops final report recommendations. Coordinates program activities with state, federal, tribal and local agencies. Provides technical support and consultation on nonpoint pollution and shellfish sanitation.

SHORELINE SURVEY ASSISTANT: A Bachelor's degree in environmental or physical science, natural science, environmental planning, or other closely allied field and one year of experience in environmental analysis, environmental health, or environmental planning. Specific training or experience in evaluating nonpoint water pollution sources and on-site systems is also required.

**TYPICAL DUTIES:** Assists the lead worker in conducting shoreline surveys of shellfish growing areas. Assesses sources of point and nonpoint pollution, prepares reports and maps of findings and assists in conducting special studies as required. Collects environmental samples as needed.

Attachment I

**EXAMPLES OF EFFECTIVE TRIBAL PROGRAMS TO PREVENT SALE OF CEREMONIAL AND SUBSISTENCE HARVEST**

The following procedures are agreed to be effective tribal means of preventing the sale of clams, oysters, mussels and scallops (hereinafter "shellfish") taken in tribal ceremonial and subsistence (C & S) fisheries.

I.  EXAMPLE ONE

1.  All areas fished by the tribe shall be closed to all harvest of shellfish, unless opened by tribal regulation.

2.  Each regulation opening an area of tideland shall state the dates and times of both opening and closure, and the species to be available for harvest. Each such regulation shall also identify the harvest area as precisely as practicable, for example, by use of a unique six digit Beach Identification Number (BIDN) assigned by agreement of the tribe and the State of Washington. The BIDN or other harvest area identification shall identify a relatively small area sharing a common growing area classification and common water quality conditions.

3.  The tribe shall maintain a toll-free phone number with a recorded message regarding current and upcoming openings and closures, or shall maintain another effective method of providing up to date opening and closure information to harvesters.

4.  One or more tribal personnel ("monitor(s)") shall be present at the growing area throughout every commercial opening, but shall not engage in harvesting. No product shall be allowed to leave the growing area during a commercial opening without inspection by a tribal harvest monitor, who shall prepare a contemporaneous record showing the name of the tribe and a unique identifier of the tribal harvester; the BIDN or other unique growing area identification; the species and estimated quantity of harvest; and the date of harvest. The tribe shall maintain all such records in its custody.

5.  To facilitate the detection of sale of shellfish taken in a C & S fishery, the tribe shall require that, upon sale of any shellfish, a record of the transaction shall be completed which includes the shellstock shipper license number of the tribe, tribal organization, or tribal member engaging in the harvest; the BIDN or other unique

growing area identification number; the species and quantity sold; and the dates of harvest and sale. Where harvest is by a person who does not personally have a shellstock shippers license, the record shall also show the unique identifier of the harvester. A copy of the transaction record shall be distributed to the tribe as soon as possible.

6. Tribal fisheries enforcement officers patrol growing areas subject to tribal jurisdiction, conduct routine, scheduled patrols of areas that are open for any type of shellfish harvest, and investigate reported or suspected violations.

7. Tribal law specifies that no more than the following quantities of shellfish may be taken by a tribally-licensed harvester in one day for ceremonial or subsistence purposes without a special permit:

a) Native littleneck clams, butter clams, cockles, and manila clams in any combination: fifty pounds in shell;

b) Horse clams: fifty clams;

c) Oysters: twenty count;

d) Geoducks: six geoducks;

e) Mussels: ten pounds in shell.

8. The above bag limits may be exceeded by special ceremonial or subsistence permit, issued to the harvester by the tribe prior to harvest, which state the place and time at which harvest will be permitted, the species and quantity that can be taken, and the name of the harvester.

## II. EXAMPLE TWO

1. Tribal regulations that govern tribal ceremonial, subsistence, and commercial fisheries are enforced by tribal enforcement staff conducting routine scheduled patrols of growing areas subject to tribal jurisdiction and investigating reported or suspected violations.

2. Tribal ceremonial shellfisheries are discrete in time and place and are opened by tribal regulation as provided for in the individual tribe's fisheries ordinance. Tribal regulations opening a ceremonial shellfishery designate the catch area and specific beach opened for harvest, the species to be harvested, the gear restrictions, date and times of opening and closure, a limited number of tribal members authorized to participate in the ceremonial fishery, the target harvest quantity and the reporting requirements. The designated tribal members participating in the fishery are required by regulation to report the harvest quantity to the tribal fisheries office within 24 hours of the close of the fishery. Records of time, place, and quantity of harvest are maintained by the tribal fisheries office.

3. Tribal subsistence shellfisheries are controlled by tribal annual and emergency regulations. Any beaches in the treaty area and subject to tribal harvest may be opened for tribal subsistence harvest, except those beaches closed for human health protection or for resource protection needs. Subsistence fishery daily bag limits per fisher are as follows:

a) Littleneck, manila, butter, soft-shell: 50 pounds combined, of which there can be no more than 25 pounds combined total of littleneck and manila clams

b) Horse: 50 clams

c) Geoduck: 6 clams

d) Cockle: 50 clams

e) Mussel: 40 pounds

f) Oyster: 100 oysters

4. Management provisions that govern the commercial fisheries can prevent the sale of non-commercial harvest. Commercial clam and oyster harvests are managed by specific beach openings and closures using emergency tribal regulations. Catch is accounted for primarily by an on-the-beach monitor who records information contained on the attached harvest monitor form. The tribe maintains all such records of commercial catch. At the time of sale, all tribal commercial catches are recorded on fish receiving tickets which are compiled, summarized and entered into a data base which is maintained at the tribal fisheries office.

## CONSENT DECREE

### Subproceeding No. 88–1

### (November 28, 1994)

BARBARA J. ROTHSTEIN, District Judge.

## I.  Nature of Dispute

In their Request For Determination Re: Regulation Of Boats Used In The Treaty Fishery, the Plaintiff Tribes claimed that their treaty fishing rights exempt them and their members from state taxation/fees and certain other regulation of their ownership and use of treaty fishing boats, specifically, the ad valorem (personal property) tax imposed on boats by Wash. Rev.Code § 84.40.065, the watercraft excise tax imposed by Wash. Rev. Code ch. 82.49, and the vessel registration and fee requirements of Wash. Rev.Code ch. 88.02. By regulation, Wash. Adm.Code 308–93–160, the State exempts from the excise tax imposed by ch. 82.49 RCW boats which are owned by Indians living on the reservation governed by the Tribe in which they are enrolled. However, the state law does not currently recognize an exemption for treaty tribe members whose principal residence is outside their tribe's reservation. The watercraft excise tax exempts watercraft exclusively used for commercial fishing purposes but is otherwise deemed applicable by the State to other treaty fishing activities. The State has also claimed that treaty fishing boats other than commercial boats documented by the Coast Guard under 33 C.F.R. § 173.11(e), or otherwise exempt by federal regulation, must be registered by state and federal regulation, display a state-issued number and decal, and that the state registration fee must be paid. Wash. Rev.Code § 82.49.030 currently provides that payment of the watercraft excise tax is a condition of obtaining a state vessel registration, number, and decal.

The Plaintiff Tribes impose, their own treaty fishing rights-related taxes and, consistent with various orders by this Court, maintain their own vessel registration requirements for boats used in their treaty fisheries. By the terms of the parties' Settlement Agreement, the State has agreed not to apply its personal property and watercraft excise taxes to boats owned by the Tribes or their members and used in the exercise of treaty fishing rights, as to each tribe that has a treaty fishing rights-related tax. The State will refund any state taxes paid on such boats as provided in the Settlement Agreement. In respect to boats used in the exercise of off-reservation treaty fishing rights, the Tribes and the State have agreed to an intergovernmental, cooperative registration procedure and to access by, or release

to, specified state, federal, foreign, and tribal law enforcement of tribal and state registration data, consistent with confidentiality protections.

Without any of the parties conceding the merits of any contrary legal position in this dispute, it as agreed as follows.

## II.  Parties

A.  This Consent Decree is entered into by and between the plaintiffs United States of America, Hoh Tribe, Jamestown S'Klallam Tribe, Lower Elwha S'Klallam Tribe, Lummi Nation, Makah Tribe, Muckleshoot Tribe, Nisqually Tribe, Nooksack Tribe, Port Gamble S'Klallam Tribe, Puyallup Tribe, Quileute Tribe, Quinault Indian Nation, Sauk–Suiattle Tribe, Skokomish Tribe, Squaxin Island Tribe, Suquamish Tribe, Swinomish Indian Tribal Community, Stillaguamish Tribe, Tulalip Tribes, Upper Skagit Tribe, and Yakama Indian Nation, defendant the State of Washington and defendant state officers ("the state defendants"), all of whom, plaintiffs and defendants, are referred to hereinafter as "the parties".

B.  Plaintiff Tribes are federally-recognized Indian tribes.  The Plaintiff Tribes, or other tribes or bands of which the Plaintiff Tribes are successors-in-interest, are parties to treaties with the plaintiff United States executed by their representatives in the 1850's, each of which reserves to the Tribes, in substantially identical language, "the right of taking fish, at all usual and accustomed grounds and stations...."  See, e.g., Art. III, Treaty of Medicine Creek, 10 Stat. 1133; *Washington v. Fishing Vessel Assn.*, 443 U.S. 658, 662 n. 2, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

C.  The specific state tax laws at issue and the registration and registration fee provisions are administered by the Washington Department of Revenue and the Washington Department of Licensing, and enforced by the defendant State of Washington through the Departments of Revenue, Licensing, Fish and Wildlife, and local governments.

D.  The interests of the United States, including the Coast Guard, have been represented by the undersigned attorney of the United States Department of Justice.

## III.  Covered Claims

A.  As used in this Decree, "covered claims" means the claims set forth in the Request for Determination in this subproceeding No. 88–1.  These claims are generally described in part I, above.  Covered claims include claims and defenses to those claims.  They include all claims and defenses which could have been adjudicated in this subproceeding as to the taxes, fees and registration requirements in dispute, had it been prosecuted to final judgment.  For the purpose of determining whether claims could have been adjudicated, reference shall be made to the facts and allegations made in the documents filed with the Court in this subproceeding prior to the date of entry of this Decree.

B.  Without admission or adjudication of any covered claim, and without waiving any objection, claim, or defense with regard to claims other than the covered claims, the parties have agreed that, in settlement of the covered claims, the state will not impose its ad valorem property and watercraft excise taxes upon the ownership or use of treaty fishing boats so long as the affected Tribe imposes a treaty fishing rights-related tax.

C. The parties agree that the covered claims raise matters of sovereign interest, and that their settlement of the covered claims as set forth in this Decree is fair, adequate, reasonable, equitable and in the public interest and is made in good faith after arms-length negotiations, and that entry of this Consent Decree is the most appropriate means to resolve the matters covered herein.

NOW, THEREFORE, before the taking of any testimony, before the adjudication of the covered claims, and without admission of any issue of law, fact, or liability by the parties, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

## IV. ORDER

A. The Court has jurisdiction over the subject matter of the covered claims and over the parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1362. Plaintiffs assert that the Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and this Court's continuing jurisdiction as declared in ¶ 24 of the Declaratory Judgment and Decree of February 12, 1974, 384 F.Supp. 312 at 408, and ¶ 25 of the Court's March 22, 1974 Permanent Injunction, 384 F.Supp. at 419, as modified by the Court's Order Modifying Paragraph 25 of Permanent Injunction (August 23, 1993). All parties to this Decree, for purposes of the entry and enforcement of this Decree, waive all objections and defenses they may have to the jurisdiction of the Court, or to venue in this District, or to service of process prior to the entry of this Decree but not afterwards.

B. The provisions of this Decree shall apply to and be binding on the parties, their agencies, subdivisions, boards, and commissions, all agents and officers thereof, and all successors and assigns of all such entities and individuals; and each of them are hereby enjoined to comply with the provisions of this Decree.

C. The attached Settlement Agreement is hereby incorporated by reference and made a part of this Decree as if fully set forth herein.

D. Except as specifically provided for otherwise in the Settlement Agreement, the plaintiffs covenant hot to sue or to take any other judicial or administrative action against any state defendant, and the state defendants covenant not to sue or to bring any type of judicial or administrative action against any plaintiff, or against any member of a Plaintiff Tribe, for covered claims or for any claims relating to or arising from the filing and litigation of the covered claims and the negotiation, terms, approval and implementation of this Decree. Should a state or tribal governmental entity, or a federal agency, enact, revoke, or amend a statute or regulation which action a party deems to be inconsistent with this Consent Decree or with the Plaintiff Tribes' treaty fishing rights as they pertain to the issues in this subproceeding, then, after complying with the dispute resolution process of § VII of the Settlement Agreement, any party may seek judicial relief to determine whether such change violates the Consent Decree and/or the Tribes' treaty fishing rights. The parties acknowledge that Congress may alter the law from that in effect at the time of entry of the Consent Decree. If it is claimed by a party that Congress, subsequent to the entry of this Decree, has effectuated a change in the jurisdictional relationship of the parties so as to extend, limit, or otherwise modify the Tribes' treaty fishing rights or the author-

ity of any other party as to the covered claims, then, after complying with § VII, the party may seek a judicial determination from this Court of whether the Congressional action or any proposed action of a party based thereon would be permitted by law notwithstanding the provisions of this Consent Decree, and whether recision or modification of the Consent Decree is accordingly required.

E. Each undersigned representative of the parties certifies that he or she is fully authorized to enter into the terms and conditions of the Decree and to legally execute, and bind such party to, the Decree.

F. Except as provided in ¶ IV.D. of this order, the terms of this Decree may be modified only by a subsequent written agreement executed by all the parties and approved by the Court. The Settlement Agreement portion may be modified as provided in ¶ IV.D. of this order, or as provided in the Agreement.

G. This Consent Decree shall be effective upon the date of its entry by the Court.

H. The Court shall retain jurisdiction for purposes of entering such further orders as may be appropriate for the construction, implementation, enforcement, or modification of the Decree. In the event that the jurisdiction retained in this paragraph, or the continuing jurisdiction of the Court over Civil No. 9213 or over this subproceeding, is terminated, this Decree shall be enforceable in the same manner as any final judgment and order of the Court.

By signature below all parties consent to entry of this Decree as an Order of the Court.

Stillaguamish and Upper Skagit Tribes

/s/
Jeffrey O.C. Lane
Karl Hausmann
Assistant Attorneys General for the State of Washington, Representing the State

/s/
Daniel A. Raas
Attorney for the Lummi
Nation

/s/
Annette M. Klapstein
Attorney for the Puyallup Tribe

/s/
Mason D. Morisset
Attorney for the Tulalip Tribe

/s/
Richard Berley
Attorney for the Makah Tribe

/s/
Sharon I. Haensly
Attorney for the Swinomish Tribal Community

/s/
Kathryn Nelson
Co–Attorney for Port
Gamble, Jamestown and
Lower Elwha S'Klallam
Tribes and the Skokomish Tribe

/s/
Peter C. Monson
United States Department of Justice

/s/
Nettie Alvarez
Attorney for the Hoh Tribe

/s/
Jack Fiander
Attorney for the Yakama Indian Nation

/s/
Richard Reich
Attorney for the Quinault Indian Nation

/s/
Robert L. Otsea Jr.,
Attorney for the Muckleshoot Indian Tribe

/s/
John Sledd
Attorney for the Suquamish Tribe

/s/
Bill Tobin
Co–Attorney for the Nisqually Tribe

/s/
Steven G. Lingenbrink
Attorney for the Quileute Tribe

/s/
Jeffrey Jon Bode
Co–Attorney for the Nooksack Tribe

/s/
Kevin Lyon
Co–Attorney for the Squaxin Island Tribe

## UNITED STATES V. WASHINGTON, NO. 9213, SUBPROCEEDING NO. 88–1 STATE TAXATION AND REGULATION OF TREATY FISHING BOATS

### SETTLEMENT AGREEMENT

I. Nature Of Dispute/Scope Of Agreement

A. The below signatory parties hereby agree to settle this subproceeding subject to the terms and conditions herein.

B. The Plaintiff Tribes claim that the state tax/fee and registration requirements, which are the subject of their Request For Determination Re: Regulation Of Boats Used In The Treaty Fishery, unlawfully infringe upon their federally secured treaty fishing rights. The State does not concede that the imposition of such requirements upon the subject boats constitutes such an infringement. Nothing herein shall be deemed to adjudicate the merits of the claim that the Tribes' treaties and other federal law immunize members of tribes with federally secured fishing rights from state taxation and vessel registration. No provision of this Agreement shall be construed to concede the correctness of any argument, claim or defense in support of state authority over the Tribes and their members, or to constitute consent to any state jurisdiction. Similarly, the State's agreement to settle shall not be deemed an acknowledgment by the State of the correctness of the Tribes' claims. Nothing herein shall be deemed to adjudicate the merits of the State's claims that it has the jurisdiction and authority to impose a. tax upon vessels used by the Tribes or their members, off reservation within the State, even if used in the exercise of tribal treaty fishing rights and to require registration of all such vessels used within the State. The State does not concede that it lacks jurisdiction to register and otherwise regulate treaty fishing boats. For purposes of this settlement, the terms "boat(s)" and "vessel(s)" have been used interchangeably and shall be considered synonymous.

C. The State recognizes that Tribes who are parties to *United States v. Washington* currently impose various taxes related to treaty fishing and that Tribes also require their members to register their boats for use in the treaty fishery.

II. Taxation

A. The State agrees that state ad valorem property and watercraft excise taxes shall not be imposed upon any boat owned by a tribal member(s) and used in connection with the exercise of federally secured fishing rights, so long as the member's tribe imposes a treaty, fishing rights-related tax. The taxes also shall not apply to tribally owned boats used in connection with or in activities related to the exercise of tribal fishing rights, including but not limited to, management, regulation or enforcement thereof. The State shall direct that no action be taken by the State, coun-

ties or other subdivisions to collect the subject taxes, including interest and penalties thereon which may have been deemed to accrue, from members of Tribes holding adjudicated treaty fishing rights and imposing a treaty fishing rights-related tax. If a signatory Tribe determines to discontinue imposing a treaty fishing rights-related tax, and the State thereafter attempts to assess a state tax, the Tribe may challenge in this Court the taxation as infringing on its treaty rights.

B. This settlement shall be retroactive in its effect. The State, including but not limited to its counties and other political subdivisions, shall not attempt to collect, enforce, or otherwise give effect to any prior alleged obligation, claim, assessment, or assertion by the State that a tribal member was required to pay the subject state taxes during any year in which that member was authorized by his or her Tribe to use his or her boat in connection with the exercise of the Tribe's adjudicated, federally secured right and when the Tribe had a treaty fishing rights-related tax.

C. Within 45 days of the Court's approval of this Settlement Agreement, each Tribe shall provide the State with a list of fishers (including owners) and their boats against whom or which any tax that is the subject of this Agreement has been assessed or levied. The Tribe shall certify that the boats on the list are subject to this Agreement. Immediately after the State has received a Tribe's list, the State shall determine whether there is information in its possession, other than the off-reservation residence of an owner or vessel, which is at variance with information on the Tribe's list. The State shall then forthwith cause all assessments or levies issued against the listed fishing boats owned by members of any Plaintiff Tribe, with respect to which no pertinent conflict in information exists, to be withdrawn and abated. If information in the possession of the State conflicts with information contained in a Tribe's list, the State and the Tribe shall immediately confer to resolve the conflict. In the absence of resolution, the matter shall be referred for dispute resolution pursuant to § VII. of this Agreement. The State shall also review its records using its best efforts to identify whether there are any additional, identifiable tribal members or treaty fishing boats against whom a tax subject to this Agreement was levied or assessed. The State shall withdraw and abate all such additional assessments and levies upon determining that such tribal members or boats are not subject to tax under the provisions of this Agreement.

D. The State shall with respect to any taxes for which the levies or assessments have been withdrawn or abated, cause to be withdrawn or released any recorded liens evidencing such outstanding taxes and will record that documentation as is permitted to confirm such withdrawal or release.

E. The State shall proceed in like manner upon the receipt of an additional list(s) from a Tribe or upon request of a boat owner or fisher who is a tribal member.

F. Notification to the State for purposes of this provision shall be made to:
Special Programs Division
Washington State Department of Revenue
P.O. Box 47472
Olympia, WA 98504–7472

G. Tribal members shall be entitled to a refund from the State of any tax paid pursuant to Wash. Rev.Code ch. 84.40 or Wash. Rev.Code ch. 82.49, upon submission of evidence that the person seeking the refund paid the tax or is a successor or

assign of such person. Additional evidence shall be submitted which establishes that at the timer of payment, the member's Tribe had a treaty fishing rights-related tax and the member was authorized by the Tribe to fish in accordance with the Tribe's treaty right. Refunds shall be payable with respect to (1) ad valorem property taxes paid pursuant to Wash. Rev.Code ch. 84.40, for 1988 and any tax periods subsequent thereto; and (2) watercraft excise taxes paid pursuant to Wash. Rev.Code ch. 82.49 for 1984, and any tax periods subsequent thereto.

III. Boat Registration

A. Certain tribal and treaty fishing boats are not subject to state registration as a matter of state law because they are documented, primarily commercial vessels, or otherwise exempt, although such boats may be subject to tribal registration and numbering requirements under applicable tribal law. *See,* Wash. Rev.Code § 88.02.030. Nothing in this Agreement shall act to affect any boats or the owners of any boats which are not the subject of this proceeding, including boats or owners to the extent they are exempt from the state tax and/or registration provisions at issue based on use exclusively within a Plaintiff Tribe's reservation.

B. State registration, numbering, and fee requirements otherwise applicable to a non-treaty boat, also shall not be applied to any other tribally owned boat and any boat owned by a tribal member(s), which is used in the exercise of treaty fishing rights and tribally registered as provided in this Decree. As required by this Decree, a vessel number conforming to the specifications of 33 C.F.R. §§ 173.27 and 33 C.F.R. 174.23, and a certificate of number conforming to 33 C.F.R. 174.19, shall be assigned, and a "decal" [i.e., annual registra-

tion sticker] shall be issued for such boat and displayed provided that, upon agreement of the Coast Guard and Tribes, different specifications may be established for the treaty fishing vessels.

C. Each Tribe shall be entitled to a block of numbers with a unique tribal suffix. Each Tribe may select a unique, three letter suffix for its state or tribally produced vessel number, which conforms to 33 C.F.R. 174.23, unless otherwise agreed by the Coast Guard. The vessel numbers shall otherwise be of the same size and placed in the same location as specified for those boats registered under RCW ch. 88.02. The decal may also be unique to each Tribe or group of Tribes, so long as otherwise conforming to Coast Guard specifications regarding size and color now contained in 33 C.F.R. § 174.15. Other than a decal, the State does not issue a plaque, sticker, or other form of number or annual registration to affix to a numbered vessel. Such items are privately manufactured. Any or all of the Tribes may produce their own vessel numbers and/or decals, provided that each vessel number shall have a "WN" prefix and conform to Coast Guard specifications as to the form of numbering, number placement, and decal placement, except as otherwise agreed to by the Coast Guard and Tribes. A Tribe may choose to use state decals, issued by the State. Within 90 days of the signing of this Agreement, or by January 1, 1995, whichever comes first, and prior to June 1st of each year for which new or renewed registrations are required by the terms of this Agreement, the State will provide each Plaintiff Tribe a list of vessel numbers, and state decals if the Tribe so requests, in the quantity, and with any particular three-letter suffix specified by the Tribe conforming to 33 C.F.R. 174.23 or as otherwise agreed by the Coast Guard. Such quantity shall be sufficient

to enable each Tribe to issue a vessel number to each of its tribal fishers for the boat(s) they use in the treaty fishery, when required by this Decree or tribal law. Notwithstanding the foregoing, the State need not provide a Tribe the list and decals sooner than thirty (30) days after the Tribe has advised the State of its number and decal requirements.

D. Tribal and treaty fishing boats shall be deemed by the State and Coast Guard to be properly registered so long as the following conditions are met:

1. the individual tribal member has provided the Plaintiff Tribe of which he or she is a member, on forms to be satisfactory to both the Plaintiff Tribes and the State, information listed below in § P; and

2. the appropriate Tribe has approved registration of the boat and so advised the State on agreed forms which shall contain all the information about the vessel and its owner which the Tribe is required to collect under § F of this Agreement.

E. The registering Tribe may issue a vessel number from the list obtained from the State, upon tribal approval of a tribal member's registration application; and such registration, which shall be for a term of one year, shall be in immediate effect and remain in effect until suspended or revoked by the Tribe, or until it expires, unless through dispute resolution and/or the processes in § H below, it is determined that the registration should be withdrawn. This shall not preclude the issuance of additional numbers by a tribe for a treaty fishing vessel, consistent with number placement limitations. A record of the registration shall be entered as soon as possible into the agreed computer data base, as provided in § K below.

F. Each Tribe shall collect the information listed in 33 C.F.R. § 174.17, for each boat registered by it. A copy of that list is appended and identified as Attachment A.

G. Each Plaintiff Tribe shall forward the agreed upon forms and documentation to the State along with the necessary documents within five working days after approval of the registration. The State shall designate one office in the Olympia office of the Department of Licensing which shall process all forms under this Agreement.

H. The Department may object to and/or seek revocation of tribal issuance of a registration only if it appears that (1) inaccurate or false information has been submitted; (2) information listed in § F has been omitted; (3) or the Department obtains information that the vessel is stolen or otherwise not beneficially owned by the registrant(s). The notice shall be served personally or sent by certified mail, return receipt requested, from the state to the appropriate Tribe. The Tribe shall within thirty days of receipt, provide the information requested, take the requested action, clarify any misunderstanding or inform the State that the Tribe does not intend to take the action requested or provide the requested information. Nothing in this Agreement shall bar the State from requesting correction of inaccurate information or revocation of a tribally issued registration and number at any time should information demonstrate that the information originally submitted was false or inaccurate, or that the vessel is stolen or not beneficially owned by the registrant. The registrant and Tribe shall have a reasonable opportunity to correct inaccurate information.

I. Nothing herein shall act to revoke, nor shall any Tribe be required to revoke, the registration, number and boat decal issued by the Tribe to the tribal member

until the State has exhausted all dispute resolution procedures under this Agreement. If the State establishes that the registration is improper, the Tribe shall revoke the registration, plaque, and decal.

J. Failure of the State to provide a list of boat numbers requested by a Tribe in the time frames outlined in this Agreement shall not preclude the Tribe or tribal fishermen from lawfully fishing pursuant to the treaty fishing right, and shall be a complete defense in any action by the State to enforce its tax or boat registration laws until the State complies with the terms of this Agreement.

K. The registration data shall be stored utilizing a computer system, with twenty-four hour availability, and procedures which will limit access to civil or criminal law enforcement entities seeking information for law enforcement purposes. The parties agree that unless ordered by a court of competent jurisdiction, no access by business persons or other private individuals shall be permitted unless the treaty fisher or Tribe has authorized such release of information in writing. Release of information may be made to other persons or groups when specifically authorized in writing by all persons identified in the information to be released. The particular computer system and procedures may vary over time. However, the parties agree to use initially the Washington Department of Licensing system, so long as access by other than law enforcement entities is prohibited. The State shall defend against any private party's attempt to establish a legal right to obtain tribal registration data, shall notify the affected Tribe of any such private party claim at the time the claim is made, and shall keep the Tribe informed as to the status of the matter. Access to the tribal information shall be available via a modem, or other suitable

electronic format, to all state, tribal, federal, and foreign law enforcement agencies. Information available by computer shall not be considered in the possession or control of any other party.

The State and the Plaintiff Tribes will also allow on-line access between and among all parties' vessel registration information systems to permit state, tribal, and federal enforcement personnel to directly obtain vessel registration information from the various governments' vessel information systems, regarding treaty and non-treaty boats. No altering of another party's information shall be made without that party's consent. The parties shall review after the first year, and annually if any of the parties deem that appropriate, the suitability of the state system and procedures to address the parties' various concerns. The parties shall investigate and consider other systems and procedures if any party so desires. The parties agree that alternatives that may prove suitable include, among others, a federal system, or a tribal system, which system may be organized, at the Tribes' sole discretion, by an individual tribe or by more than one tribe acting together. Like the initial system, an alternative system or network shall provide, at a single point of contact, twenty-four hour on-line access to all the information for all the Plaintiff Tribes required to be available under § F.

L. If a Tribe becomes aware that information regarding a boat authorized by that Tribe to participate in the treaty fishery, and contained in the state boat identification system, or the boat identification system of another Tribe, may be erroneous or incomplete and should be corrected, that Tribe will promptly notify the State or the Tribe which operates the identification system. The notice to the system operator shall state the reasons why it is believed the system information is incorrect or in-

complete. The notifying Tribe shall also identify the correct or additional information the Tribe believes should be entered into the system. The system operator shall respond promptly to each such notice regarding inaccurate or incomplete information, explaining what, if any, changes or corrections have been made.

M. The State shall advise and direct state and local enforcement agencies not to enforce state vessel registration requirements as to boats owned by Tribes with treaty secured fishing rights, or their members, and registered and numbered as required by tribal law and this Agreement for use in the treaty fishery. The State shall also notify the appropriate enforcement agencies of other states and the federal government that these state requirements should not be enforced except in accordance with the terms of this Agreement.

## IV. Enforcement of Vessel Registration And Identification Requirements

A. The provisions of this section are intended to provide procedures for cooperative, state/tribal enforcement of the requirements of this Agreement relating to vessel registration and identification. In furtherance of this objective, the parties agree to the following acts and forebearances which allow for cooperative, enforcement protocols. Except as specifically provided in this section, this section is not intended to relate to enforcement of any other laws. Nothing in this Agreement shall be deemed to be a concession by any party as to the existence or lack of jurisdiction over the Plaintiff Tribes or their members. Nothing herein shall act to expand, diminish or limit the Plaintiff Tribes', State's, or federal government's jurisdiction over tribal members nor be a grant of jurisdiction by the Plaintiff Tribes

to the State or federal government or the State or federal government to the Plaintiff Tribes. Nor shall any provision herein be deemed to waive any defense, protection, or other right a member may have in regard to enforcement, under the rulings of this Court or other law. *See, e.g., United States v. Washington,* 384 F.Supp. 312, 408–409 (W.D.Wash.1974). "State" includes all subdivisions of the State and other enforcement entities bound, through the State, under the provisions of this Consent Decree.

### B. Violations Within Indian Country

The State shall not take any action as to any violation by a member of a Plaintiff Tribe of vessel registration and identification requirements occurring within an Indian reservation, tribal trust lands, or other areas of Indian country of that Plaintiff Tribe. For purposes of this Agreement, "Indian country" shall have the definition set out in 18 U.S.C. § 1151, as interpreted and applied by the federal courts.

### C. Violations Outside Indian Country

1. The State may take action to enforce state vessel registration and identification requirements against any Indian where the violation occurs outside of any Indian reservation, tribal trust lands, or other Indian country as that term is used herein, of a Plaintiff Tribe in which the Indian is a member, in the following situations and subject to the following limitations:

a. if the vessel is not operated on behalf of a Tribe in connection with that Tribe's treaty fishing right and is not claimed by the owner or operator to be a treaty fishing vessel;

b. if an enforcement officer observes a vessel he or she reasonably believes to be without proper, current and effective state, federal, or tribal registration or identification, he or she may detain the

vessel regardless of ownership to determine if the owner or operator claims the vessel is a treaty fishing vessel and whether the owner, operator or other occupant has in his or her possession a currently effective tribal fishing identification card, a tribal fishing permit, tribal registration document for that vessel, tribal membership card, or other similar, written evidence that the vessel is a treaty fishing vessel subject to registration and identification requirements administered by a Plaintiff Tribe, provided that the state officer shall detain the vessel owner, operator, or other occupant no longer than is permitted under the search and seizure law of the state or federal constitution, whichever is more restrictive. If no such evidence is produced and the vessel is not then currently registered and numbered through the applicable Tribe (or the State), although claimed to be a treaty fishing vessel, the state officer may take enforcement action under state law.

2. Referral To Tribe

a. If such evidence that the vessel is a treaty fishing vessel is produced and delivered within thirty (30) days following the date of the citation or other enforcement action to the office of the enforcement agency issuing a citation or taking other enforcement action, by the person against whom enforcement action is taken or by the Plaintiff Tribe of which that person is a member, the matter shall be referred to the applicable Plaintiff Tribe within ten (10) days after such evidence is produced and delivered.

b. If the owner or operator of the vessel claims the vessel is a treaty fishing vessel covered by this Agreement and the owner or an occupant produces one or more of the items of evidence set out above in this subsection, then the enforcement officer, as to the apparent registration and identification violation, may detain the vessel, subject to the same time limitation set forth in § IV.C.1.b. above, to obtain the information necessary for the issuance of a citation for that alleged violation and may take such action as is necessary to protect officer safety and to obtain or preserve any relevant evidence. Within ten (10) days after the stop, the enforcement agency responsible for the stop, shall refer the apparent violation to the applicable. Plaintiff Tribe.

c. Whenever a state: officer believes a violation has occurred by a tribal member under the circumstances set out in § IV.C.2.b., the officer shall, as soon as practicable, attempt to contact law enforcement of the Tribe in which the operator or occupant(s) claims fishing rights, using common means of law enforcement communication such as radio over common frequency, telephone, or a dispatcher utilized by that Tribe. The state officer, to the extent authorized under applicable law, may, when requested by a tribal officer, detain, or continue to detain the violator. A copy of any citation or other enforcement notice to a person claiming treaty fishing rights shall be sent to the Plaintiff Tribe in which treaty fishing rights are claimed, provided that sending a copy of such document shall not be considered a referral of the matter to the. Tribe under this § IV.

d. No state prosecution for an alleged vessel registration/identification violation by a member(s) of Plaintiff Tribes or by a tribal licensee(s) shall be initiated before the expiration of sixty days (60) days following the appropriate Tribe's receipt of a referral, to allow the Tribe to determine whether the incident also violates tribal law and whether the

Tribe chooses to prosecute in tribal court or another tribal governmental forum. If, following referral of a possible vessel registration or identification violation to a Plaintiff Tribe, the State commences a civil, criminal, or administrative enforcement action for such violation during the sixty day tribal review period, and if during that sixty day period the state or local enforcement agency receives written notice from the Tribe that the Tribe has commenced its own enforcement action against the same tribal member for the same incident, that state or local enforcement agency shall request that the prosecutor, or similar officer to whom it has referred the case for prosecution, withdraw the case to let the Tribe proceed instead. Nothing in this Agreement shall prevent a Plaintiff Tribe from requesting at any time that a state prosecutor, or similar officer, exercise his or her prosecutorial discretion to dismiss or defer a state action against a member of that Tribe for a vessel registration or identification violation when the Tribe brings its own enforcement action against the same tribal member arising out of the same incident.

e. Referrals shall be made by transmitting or mailing an incident report to the appropriate law enforcement office of the Plaintiff Tribe of which the person or persons alleged to have committed the violation is, or are, a member(s). The report shall contain a summary of the observations of the officer(s) detaining the vessel, the information taken by the officer(s) necessary to support the issuance of a citation and a summary of any other actions taken by the officer(s). Any evidence seized shall be delivered with the report.

f. Within sixty (60) calendar days following the date the Tribe receives the incident report and notice of the referral, the tribal enforcement entity shall notify the enforcement supervisor of the state agency making the referral whether the Tribe (a) has initiated an enforcement action under tribal law for failure to properly register or identify the vessel involved in the incident; (b) has determined not to initiate or pursue an enforcement action, although permitted by tribal law and the basis for that decision; or (c) has no basis to pursue an enforcement action under tribal law, in which case the matter shall be promptly referred back to the referring state agency which may then pursue enforcement under state law except in a situation covered by (b) involving the exercise of prosecutorial discretion. *See*, § IV.C.2.i., *infra.* The State may also proceed with enforcement action for possible vessel registration and identification violations if the Tribe does not respond within the sixty-day period following the date the Tribe receives the incident report and notice of the referral.

g. If the Tribe has instituted an enforcement action, the tribal enforcement entity shall notify the enforcement supervisor or equivalent officer of the state agency making the referral at least fifteen (15) calendar days in advance of any hearing or trial date in that tribal action. The State shall make its enforcement officers available for tribal hearings and trials, and shall provide reasonable cooperation in such prosecutions.

h. As provided in § III.J, failure of the State to issue a list of numbers and decals in the manner and time provided in § III.C above shall be a defense to any such violation occurring during the

period in which the numbers or decals have not been made available to the Plaintiff Tribe in which the alleged violator is a member. If the State has failed to comply with § III.C, and this failure is shown to be the cause of the alleged violation, the State shall withdraw its citation with respect to the vessel.

i. While it is expected that all parties will vigorously enforce their registration and identification requirements, this Agreement is not intended to inhibit the exercise of reasonable prosecutorial discretion by state or tribal prosecutors in regard to determining that a particular case should not be prosecuted or that lesser penalties or other resolution should be sought. Disagreements over whether prosecutorial discretion is being exercised reasonably shall be addressed as provided in § IV.D.4, *infra*, in the same manner as other enforcement concerns.

D. Other Cooperative Enforcement Measures

1. At least semiannually, each Tribe shall notify the State Department of Licensing of the status or disposition of all referred cases involving an alleged vessel identification violation, including the name of the referring agency, whether and what charges were filed, the amount of any fines, and the nature of any other penalties, including permit suspension or revocation, restrictions, probation or other disposition.

2. The enforcement supervisors of the State and Tribes shall meet as needed (at least annually for the first three years following the effective date of this Agreement, and thereafter at least every two years) to discuss matters related to implementation of this Agreement, including the exchange of information regarding violations, the training of officers, and the planning of joint patrols or other joint operations.

3. Within three months following the entry of this Consent Decree, the parties shall meet to discuss cross-deputization of state and tribal enforcement officers and the applicable procedures and criteria should the parties agree that cross-deputization is desirable.

4. If the State believes a Tribe has failed to enforce its registration and identification requirements or any Tribe believes the State is not complying with provisions for referral of incidents to a Tribe or otherwise failing to meet the terms of this Agreement, the State or Tribe(s) shall so notify the other parties, and provide the factual basis for their belief, in writing. If the matter is not resolved to the parties' satisfaction within a reasonable time, not to exceed sixty (60) days, unless the parties agree otherwise, dispute resolution may be pursued in accordance with § VII, below.

V. Consistency Of Agreement With Federal Vessel Numbering And Other Federal Boating Safety Requirements

In agreeing to this settlement, neither the United States, through the U.S. Coast Guard, Department of Transportation, nor the Tribes make any concession as to the applicability or inapplicability of federal laws dealing with vessel identification to treaty fishing boats. The United States confirms that, whether or not these laws apply to treaty fishing boats, the cooperative, intergovernmental vessel numbering and registration provisions of this settlement are consistent with and satisfy the federal requirements, contained in 46 U.S.C. § 12301 et seq.; 33 C.F.R. Part 173. Compliance with this Agreement will not jeopardize Coast Guard certification of the State. The Coast Guard specifically

agrees hot to sanction the State in any manner for any difference in the way the State treats treaty or tribal and nontreaty boats, so long as such treatment is consistent with this Agreement.

## VI. Alternative Tribal Registration Systems

Nothing in this Agreement shall preclude the Tribes and the United States from investigating, developing, and adopting an alternative system for vessel numbering and record-keeping for tribal boat and treaty fishing boat. Tribes, without affecting or waiving their legal position that the federal law and numbering system does not apply to their tribal and treaty fishing boats, may seek an exemption from the federal provisions or seek an amendment to those provisions.

## VII. Dispute Resolution

A. Any party to this Agreement may invoke the jurisdiction of the federal court to resolve issues related to the implementation of this Agreement, other than the question of whether the terms of this Agreement are required by or consistent with the Tribes' treaty fishing rights unless permitted by § IV.D. of the Court's Order approving this Agreement. Prior to invoking federal court jurisdiction, the parties shall proceed to attempt to resolve such dispute in accordance: with paragraph 25 of the Court's March 22, 1974 permanent injunction in *United States v. Washington,* 384 F.Supp. 312, 419, as amended by the Court's August 23, 1993. Order Modifying Paragraph 25 of Permanent Injunction, and any subsequent amendment thereto. Such procedures for resolution of disputes between the parties shall be employed toward the resolution of all disputes concerning violations of this Agreement and all other issues between the parties arising under this Agreement,

except as otherwise expressly provided herein. The parties will abide by the final adjudication of a dispute over boat ownership by a state or tribal court with jurisdiction over such dispute.

B. In the event of disagreement between the parties in regard to a vessel number or registration issued by a Plaintiff Tribe, no treaty fisher or Tribe shall be precluded from using a boat, which a Tribe considers in compliance with tribal registration requirements, for the exercise of treaty fishing rights, pending final disposition of a dispute affecting that boat, pursuant to the procedures required by the preceding paragraph.

C. At the request of a party after the first year of the operation of this Settlement Agreement, the parties will meet to review the implementation of the Agreement. Upon further request of a party, such other meetings may be held annually, unless the parties consent to a more frequent interval. Such meetings shall be in addition to, or held concurrently with, the meetings required by § IV.D.2. of this Agreement.

## VIII. Notification

Each of the parties to this Agreement shall provide at least one name and one alternate contact, with their address, phone number, and fax number, for all notification. All notices which are not initially transmitted by mail, shall be followed by a mailed, written notice, unless the parties otherwise agree.

## IX. Distribution To Enforcement Agencies And Personnel

Immediately after judicial approval of this Agreement, the State shall provide a copy of this Agreement and other portions of the Consent Decree to each and every county prosecutor, county sheriff, and law enforcement office of the State, including

its political subdivisions. The Plaintiff Tribes shall similarly distribute copies of the Agreement to their enforcement agencies and personnel. Each copy shall be accompanied by a notice reciting that the federal district court has approved a Consent Decree settling a dispute over the application of certain state taxes, fees, and vessel registration requirements to treaty fishing boats, that particular attention should be given to § IV on Enforcement Of Vessel Registration And Identification Requirements, and that all enforcement entities must comply with the Settlement Agreement.

X. Amendments

The parties recognize that individual tribes, groups of tribes, or the State may wish to amend this Agreement or to reach new agreements governing vessel registration and data sharing, and to that end, any of these entities or groups may propose an amendment for consideration by the parties. Unless the parties agree otherwise, or a compelling reason exists for more frequent amendment, proposed amendments shall be considered at an annual meeting to review the parties' progress in implementation.

Until an amendment or a new agreement is adopted by the parties, and court approval is obtained, this Agreement shall be binding.

XI. Judicial Approval

This Agreement shall become effective upon signature of the authorized representatives of the parties and approval of the Court in *United States v. Washington,* Subproceeding 88–1. This Agreement is not intended and shall not be construed as the admission of any party, as findings of fact, conclusions of law, or the interpretation or construction of the law applicable to this case. No party shall toe considered

to have prevailed with respect to resolution of this issue or shall be entitled to its costs or fees.

If for any reason the Court should decline to approve this Settlement and Decree in the form presented, any statements made in negotiation and the terms herein may not be used as evidence in any litigation or administrative proceeding. If the Court declines to approve this Settlement Agreement and Decree in the form presented, the settlement embodied herein shall be voidable at the sole discretion of any party upon written notice to all parties and to the Court.

ATTACHMENT A

**§ 174.17 Contents of application for certificate of number.**

(a) Each form for application for a certificate of number must contain the following information:

(1) Name of the owner.

(2) Address of the owner, including ZIP code

(3)-(4) [Reserved]

(5) State in which vessel is or will be principally used.

(6) The number previously issued by an issuing authority for the vessel, if any.

(7) Whether the application is for a new number, renewal of a number, or transfer of ownership.

(8) Whether the vessel is used for pleasure, rent or lease, dealer or manufacturer demonstration, commercial passenger carrying, commercial fishing, or other commercial use.

(9) Make of vessel.

(10) Year vessel was manufactured or model year.

(11) Manufacturer's hull identification number, if any.

(12) Overall length of vessel.

(13) Type of vessel (open, cabin, house, or other).

(14) Whether the hull is wood, steel, aluminum, fiberglass, plastic, or other.

(15) Whether the propulsion is inboard, outboard, inboard-outdrive, sail or other.

(16) Whether the fuel is gasoline, diesel, or other.

(17) The signature of the owner.

(b) An application made by a manufacturer, or dealer for a number that is to be temporarily affixed to a vessel for demonstration, or test purposes may omit items 9 through 16 of paragraph (a) of this section

(c) An application made by a person who intends to lease or rent the vessel without propulsion machinery may omit items 15 and 16 of paragraph (a) of this section.

[CGD 79–087, 47 FR 8176, Feb. 25, 1982]